**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3470, 16-3552, 16-3867 & 16-3868
_____

IN RE: PETITION OF FRESCATI SHIPPING
COMPANY, LTD., AS OWNER OF THE M/T ATHOS
I and TSAKOS SHIPPING & TRADING, S.A., AS
MANAGER OF THE ATHOS I FOR EXONERATION
FROM OR LIMITATION OF LIABILITY
(E.D. Pa. No. 2-05-cv-00305)

UNITED STATES OF AMERICA

v.

CITGO ASPHALT REFINING COMPANY; CITGO
PETROLEUM CORPORATION; CITGO EAST
COAST CORPORATION
(E.D. Pa. No. 2-08-cv-02898)

CITGO Asphalt Refining Company; CITGO Petroleum
Corporation; CITGO East Coast Oil Corporation,
                    Appellants in Nos. 16-3470; 16-3552

Frescati Shipping Company, Ltd.; Tsakos Shipping and
Trading, S.A.,
Appellants in No. 16-3867

United States of America
Appellant in No. 16-3868
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Nos. 2-05-cv-00305; 2-08-cv-02898
District Judge: The Honorable Joel H. Slomsky

Argued November 8, 2017

Before: SMITH, *Chief Judge*, HARDIMAN,
*Circuit Judge*, and BRANN, *District Judge**

(Filed: March 29, 2018)

Timothy J. Bergère            **[ARGUED]**
Alfred J. Kuffler
John J. Levy                  **[ARGUED]**
Montgomery McCracken Walker & Rhoads

---

*The Honorable Matthew W. Brann, United States District
Judge for the Middle District of Pennsylvania, sitting by
designation.

2

123 South Broad Street
24th Floor
Philadelphia, PA 19109

Eugene J. O'Connor
Montgomery McCracken Walker & Rhoads
437 Madison Avenue
29th Floor
New York, NY  20022

Jack A. Greenbaum
22782 Buendia
Mission Viejo, CA 92691
        *Counsel for Frescati Shipping Co. Ltd. and
          Tsakos Shipping and Trading S.A.*

Matthew M. Collette
United States Department of Justice
Civil Division
Room 7212
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Stephen G. Flynn
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, DC 20044

Anne Murphy                        **[ARGUED]**
United States Department of Justice

Appellate Section
Room 7644
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
　　　*Counsel for United States of America*

Benjamin Beaton
Jacqueline G. Cooper
Carter G. Phillips　　　　　　**[ARGUED]**
Richard E. Young
1501 K Street, N.W.
Washington, DC 20005
　　　*Counsel for Citgo Asphalt Refining Co.*
　　　　*Citgo Petroleum Corp.*
　　　　*Citgo East Coast Oil Corp.*

George R. Zacharkow
Deasey Mahoney & Valentini
1601 Market Street
Suite 3400
Philadelphia, PA 19103
　　　*Counsel for Intervenor Respondent*
　　　　*International Liquid Terminal Ass'n*
　　　　*American Fuels and Petrochemicals*
　　　　　*Manufacturers Ass'n*

_____

OPINION

_____

SMITH, *Chief Judge*.

## Table of Contents

I.     **Introduction** ............................................................ 6

II.    **Background** ............................................................ 7

    a.     **Facts** ............................................................ 7

    b.     **Procedural History** ........................................ 13

III.   **Jurisdiction and Standard of Review** ............... 19

IV.   **The Safe Berth Warranty** ................................. 19

    a.     **The Draft of the *Athos I*** ............................... 21

    b.     **Frescati's Seamanship** ................................. 27

V.     **Wharfinger Negligence** ..................................... 36

VI.   **Subrogation and Equitable Recoupment** ......... 42

    a.     **Subrogation and Subrogee-Specific Defenses** ......................................................... 45

    b.     **Equitable Recoupment** ................................. 49

VII.   **Limitation of Liability under the Oil Pollution Act** ................................................................... 55

VIII. **Prejudgment Interest Rate** .............................. 58

IX.   **Conclusion** ......................................................... 61

## I. Introduction

After a 1,900-mile journey from Venezuela to Paulsboro, New Jersey, the M/T *Athos I*, a single-hulled oil tanker, had come within 900 feet of its intended berth when it struck an abandoned anchor on the bottom of the Delaware River. The anchor pierced the *Athos I*'s hull, causing approximately 264,000 gallons of crude oil to spill into the river.

The cost of cleaning up the spill was $143 million. We are presented with the question of how to apportion responsibility for that cost between three parties. The first party comprises not only the shipowner, Frescati Shipping Company, Ltd., but also the ship's manager, Tsakos Shipping & Trading, S.A. (collectively, "Frescati"). Frescati, through an intermediary, contracted to deliver crude oil to the second party, which is made up of several affiliated companies—CITGO Asphalt Refining Company, CITGO Petroleum Corporation, and CITGO East Coast Oil Corporation (collectively, "CARCO"). The oil shipment was to be delivered to CARCO at its marine terminal in Paulsboro. After the oil spill, Frescati paid for the cleanup effort, and was eventually reimbursed $88 million by the third party to this litigation, the United States, pursuant to the Oil Pollution Act (OPA) of 1990, 33 U.S.C. § 2701 *et seq.* Frescati and the United States now seek to recover their cleanup costs from CARCO.

## II. Background
### a. Facts[1]

The M/T *Athos I* was a single-hulled tanker ship, measuring approximately 748 feet long and 105 feet wide.[2] As owner of the ship, Frescati chartered it to an intermediary which assigned it to a tanker pool. CARCO sub-chartered the *Athos I* from the tanker pool to deliver a shipment of crude oil from Puerto Miranda, Venezuela, to CARCO's berth in Paulsboro, New Jersey. CARCO was the shipping customer as well as the wharfinger who operated the berth.

The *Athos I*, carrying CARCO's shipment, left Venezuela in mid-November 2004 under the command of the ship's master, Captain Iosif Markoutsis. CARCO had

---

[1] The facts are undisputed unless otherwise noted.

[2] Single-hulled tanker ships drew the attention of regulators and the public in the wake of the 1989 *Exxon Valdez* oil spill off the Alaskan coast; the *Exxon Valdez*, like the *Athos I*, was a single-hulled tanker. Single-hulled ships were initially subjected to extra regulation, *see, e.g.*, 33 C.F.R. § 157.455, but have since been phased out of operation in the United States in favor of double-hulled ships. *See* 46 U.S.C. § 3703a.

instructed the *Athos I* to load to a draft[3] of 37 feet or less in Venezuela, and provided a warranty that the ship would be able to safely reach the berth in Paulsboro as long as it arrived with a draft of 37 feet or less. When the *Athos I* left Venezuela, it had a draft of 36′ 6″. Over the course of the *Athos I*'s journey, the ship burned fuel and the crew consumed fresh water. As the ship grew lighter, it rode higher on the water. By the time it reached the entrance to the Delaware Bay, the *Athos I* was drawing 36′ 4″. Because the fuel and fresh water were consumed from tanks located in the stern, or rear, of the ship, the *Athos I* was no longer sailing at an even keel; it was "trimmed by the bow," meaning that the bow, or front of the ship, was deeper in the water than the ship's stern. To return the ship to an even keel, the *Athos I* took on approximately 510 metric tons of ballast to tanks in the rear of the ship. Although the parties dispute how much the *Athos I* was drawing as it approached CARCO's berth, the District Court found that the added ballast brought the ship's draft to 36′ 7″.

The *Athos I* reached the entrance to the Delaware Bay without incident on November 26th. All vessels

---

[3] A ship's draft is the measurement from the water line to the bottom of the ship's hull, known as the keel. As a ship loads cargo, it becomes heavier and sits lower in the water. Its draft thereby increases.

traveling north from the Delaware Bay to the Delaware River are required to use a Delaware River Pilot to navigate the waters. At the appropriate time, a local river pilot, Captain Howard Teal, Jr. boarded the ship and guided it up the Delaware River until it reached a section of the river near CARCO's berth. At that point, a local docking pilot, Captain Joseph Bethel, replaced Captain Teal and began to navigate the ship to its berth at Paulsboro. Captains Teal and Bethel both engaged Captain Markoutsis in conversations about the *Athos I*, its passage from the Delaware Bay to the Paulsboro berth, water depth, underkeel clearance, and other local conditions. The substance and sufficiency of those conversations are disputed by the parties.

CARCO's berth is on the New Jersey side of the Delaware River, directly across from Philadelphia International Airport. To reach the berth from the main river channel, ships must pass through an anchorage immediately adjacent to the berth. The anchorage, known as Federal Anchorage Number 9 or the Mantua Creek Anchorage, is a federally-designated section of the river in which ships may anchor; it is periodically surveyed for depth and dredged by the Army Corps of Engineers, as Corps resources allow. No government agency is responsible for preemptively searching for unknown obstructions to navigation in the anchorage, although the Coast Guard, the National Oceanic and Atmospheric

Administration (NOAA), and the Corps of Engineers work together to remove or mark obstructions when they are discovered. Anyone who wishes to search for obstructions in the anchorage may do so, but anyone wishing to dredge in the anchorage requires a permit from the Corps of Engineers.

It was in this anchorage on November 26, 2004, at 9:02 p.m., that the allision occurred.[4] The *Athos I* was only 900 feet—not much more than the ship's length—from CARCO's berth. The ship was "just about dead in the water" as Captain Bethel slowly positioned it to dock. Suddenly, the ship began to list and oil appeared in the river. At the time of the allision, the ship was in the middle of a 180° rotation, guided by tugboats, and moving astern and to port (backwards and to the ship's left). The path taken by the *Athos I* through the anchorage passed, at its shallowest point, over a 38-foot shoal. Most of the anchorage was deeper, and the depth of the river at the site of the allision was at least 41.65 feet at the time.

Captain Bethel immediately called the Coast Guard to alert them to the spill, while Captain Markoutsis rushed to the engine room and transferred oil from the breached

---

[4] An allision is "[t]he contact of a vessel with a stationary object such as an anchored vessel or a pier." *Allision*, BLACK'S LAW DICTIONARY (10th ed. 2014).

cargo tank into another tank. The crew of the *Athos I* was eventually able to stop the leak, but not before 264,321 gallons of crude oil had spilled into the Delaware River.

The cleanup effort began almost immediately. Although it was ultimately successful, it took months to complete and the efforts of thousands of workers at a cost of $143 million. The cause of the allision was not discovered until more than a month later, when an abandoned anchor was discovered on the riverbed. The search for the obstruction that caused the allision proved difficult. An experienced sonar operator using side-scan sonar conducted the first search shortly after the allision, but did not recognize the anchor.[5] A second search by the

---

[5] Side-scan sonar is used to locate objects on the sea floor and works like a camera, but using sound instead of light to form an image. Single-beam sonar, by contrast, uses sound to measure the depth along a single line traced by a sounding mechanism known as a towpath. If an obstruction is not located along the towpath, it would not be detected, and even if the towpath crossed an obstruction, the data would simply show a depth change rather than the obstruction itself. Before the allision, CARCO used single-beam sonar to survey its berthing area and a small portion of the anchorage. The government typically used single-beam sonar when it surveyed the anchorage for depth and dredging purposes.

same operator, conducted several weeks later, eventually discovered the anchor with the use of side-scan sonar in combination with divers and magnetometers. The anchor weighed approximately nine tons and was 6′ 8″ long, 7′ 3″ wide, and 4′ 6″ high. It has since been removed from the river.

The parties dispute the positioning of the anchor at the time of the allision. An anchor like the one that punctured the *Athos I* has two stable positions. It can sit at rest in the "flukes-up" or "flukes-down" position. A flukes-up anchor stands almost upright on its crown, with the flukes pointed upward at a 65° angle, while a flukes-down anchor has essentially tipped over, with both the crown and flukes of the anchor lying horizontally on the riverbed. In the flukes-up position, the anchor sticks up approximately seven feet above the riverbed, but in the flukes-down position, it rises only about 3′ 5″ above the riverbed. The District Court found that the anchor was flukes-up at the time of the allision, but CARCO asserts that the anchor was flukes-down, pointing to side-scan sonar data gathered as part of a geophysical study of the Delaware River that showed the anchor was flukes-down in 2001, three years before the allision.[6] The anchor was

[6] The anchor was identified in the geophysical study data only after the allision occurred. The parties agree that in 2001, the anchor was flukes-down, and that no one was

also flukes-down when it was discovered after the allision. Between 2001 and the allision in 2004, 241 vessels went to CARCO's Paulsboro berth, and many others have anchored in the anchorage over the years. The District Court theorized that one of those anchored ships could have dragged its own anchor chain along the riverbed, catching on the abandoned anchor and shifting its position. The court ultimately concluded that although the actual cause of the anchor's movement would never be known, at some point between the geophysical study in 2001 and the allision in 2004, the anchor shifted from flukes-down to flukes-up. A flukes-down anchor would not have allided with the *Athos I* if the *Athos I*'s draft was less than 37 feet; a flukes-up anchor would have.

Now, more than thirteen years after the allision, the *Athos I* has been scrapped, the anchor removed from the river, and the oil spill cleaned up. What remains is this case for apportionment of cleanup costs.

### b. Procedural History

This case, like the *Athos I*, has been on a long journey. Over the past thirteen years, the matter has been to trial before two different judges and heard on appeal

---

aware of the anchor's existence before the allision— except, perhaps, the still-unidentified owner who abandoned it.

13

before two separate panels of this Court. We briefly summarize that history.

Litigation began shortly after the allision in January, 2005, when Frescati filed a "Petition for Exoneration from or Limitation of Liability." CARCO and others filed claims for damages associated with the spill. Frescati then filed a counterclaim against CARCO for its damages. The United States eventually reimbursed Frescati for some of its cleanup expenses pursuant to the OPA, and filed suit against CARCO as a partial subrogee to some of Frescati's claims. The claims of Frescati and the United States against CARCO were consolidated with CARCO's counterclaims and defenses, forming the litigation as it exists today.

The case was first tried in a forty-one-day bench trial before the Honorable John P. Fullam. Judge Fullam found that CARCO was not liable for the casualty in contract, tort, or otherwise; Frescati and the United States appealed. On appeal, we affirmed in part, vacated in part, and remanded the case because the District Court had failed to make appropriate findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a)(1). *In re Frescati*, 718 F.3d 184, 189, 196–97 (3d Cir. 2013).

We determined, among other things, that Frescati was a third-party beneficiary of CARCO's safe berth warranty, and that the allision occurred in the approach to

14

CARCO's terminal, meaning that CARCO had an unspecified duty of care to Frescati in tort. We remanded for the District Court to determine whether Frescati met the conditions for the safe berth warranty to apply. We also asked the District Court, if necessary, to determine the appropriate duty of care CARCO owed Frescati and whether CARCO breached that duty. 718 F.3d at 214–15.

Judge Fullam retired before the case was remanded. Upon its return to the District Court, the case was assigned to the Honorable Joel H. Slomsky as a successor judge pursuant to Fed. R. Civ. P. 63. Under the terms of that rule, Judge Slomsky certified his familiarity with the record and recalled more than twenty witnesses over the course of a thirty-one-day proceeding.

The District Court held that CARCO was liable to Frescati, and the United States as Frescati's subrogee, for breach of contract. CARCO's contract included a provision known as a safe berth warranty, which, for purposes of this appeal, warrantied that CARCO's berth would be safe for the *Athos I* as long as the ship had a draft of 37 feet or less and Frescati did not cause the allision through bad navigation or negligent seamanship. The District Court concluded that CARCO breached the warranty because the *Athos I* had a draft of 36′ 7″ at the time of the allision, exercised good navigation and seamanship, and yet still hit an anchor within the geographic area covered by the warranty. On appeal,

15

CARCO argues that the *Athos I* had a draft much deeper than the warrantied depth of 37 feet, and that Frescati demonstrated negligent seamanship by violating several federal maritime regulations relating to underkeel clearance and safe navigation.

The District Court also found CARCO liable in tort to Frescati,[7] concluding that CARCO had a duty, as operator of the berth, to search for obstructions in the approach to its berth. Specifically, the District Court concluded that CARCO had a duty to use side-scan sonar to search for unknown obstructions to navigation in the approach to its berth, and to remove any such obstructions or warn invited ships—like the *Athos I*—of their presence. Because CARCO had not taken any action to search for obstructions, the District Court held CARCO liable in tort—for the same amount for which it was liable in contract. The District Court's contract and tort holdings independently support the judgment for Frescati.

CARCO, in a motion for partial summary judgment before the District Court, asked that its liability, like Frescati's, be limited under the OPA. Because CARCO did not raise the defense until after the first trial and

---

[7] The United States is not a party to the tort claim, pursuant to a partial settlement agreement it reached with CARCO in 2009.

appeal, almost a decade into this litigation, the District Court held that the defense was waived, and in the alternative, that it failed on the merits.

The District Court did, however, partially credit CARCO's equitable recoupment defense against the United States. CARCO argued that the conduct of three federal agencies—the Coast Guard, NOAA, and the Army Corps of Engineers—misled CARCO into believing that the United States was maintaining the anchorage free of obstructions. In addition, CARCO argued that equity requires the United States to bear the cost of the cleanup rather than CARCO. The District Court ultimately reduced the United States' recovery against CARCO by 50%, rather than acceding to CARCO's request to eliminate its liability entirely.

Finally, the District Court held that Frescati was entitled to prejudgment interest at the federal postjudgment rate rather than the higher U.S. prime rate requested by Frescati.

The District Court ultimately awarded Frescati $55,497,375.95[8] on the claims of breach of contract and

---

[8] Frescati's liability under the OPA for the cost of cleaning up the spill was limited to approximately $45 million. The United States reimbursed it for the remaining $88 million of its qualifying cleanup expenses. In addition to the $45

negligence, plus prejudgment interest of $16,010,773.75, for a total judgment of $71,508,149.70. The United States, after the court's 50% reduction, was awarded $43,994,578.66 on its subrogated breach of contract claim, with prejudgment interest of $4,620,159.98, for a total judgment of $48,614,738.64.

All three parties now appeal. We will affirm the District Court's judgment in favor of Frescati on the breach of contract claim and the prejudgment interest award, as well as the District Court's denial of CARCO's motion for partial summary judgment on its limitation of liability defense. We will vacate the District Court's judgment in favor of Frescati on the negligence claim. We will affirm in part the District Court's judgment in favor of the United States with respect to CARCO's liability on the subrogated breach of contract claim, but because

---

million in OPA damages, Frescati also incurred roughly $10 million in damages that fell outside the scope of the OPA's liability cap—third-party claims; cleanup expenses for recreational boats; the cost of removing the anchor and the pump casing from the riverbed; a settlement with a nearby nuclear power plant that had to shut down; unrepaired hull damage to the *Athos I*, and other miscellaneous expenses. Frescati's contract recovery of $55 million was based on both its OPA and non-OPA damages.

18

CARCO's equitable recoupment defense fails, we will reverse and remand for further proceedings to recalculate damages and prejudgment interest.

## III. Jurisdiction and Standard of Review

The District Court had admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1). We have jurisdiction over this appeal under 28 U.S.C. § 1291.

"On appeal from a bench trial, we review a district court's findings of facts for clear error and exercise plenary review over conclusions of law." *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 870 F.3d 244, 253 (3d Cir. 2017). "A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 283 (3d Cir. 2014); *In re Frescati*, 718 F.3d at 196.

## IV. The Safe Berth Warranty

CARCO promised that the *Athos I* would be directed to a location "she may safely get (always afloat)," a promise known as a safe port or safe berth warranty. JA at 1211. Such a promise provides, among other things, "protection against damages to a ship incurred in an unsafe port to which the warranty applies." *In re Frescati*, 718 F.3d at 197.

19

A port is deemed safe where the particular chartered vessel can proceed to it, use it, and depart from it without, in the absence of abnormal weather or other occurrences, being exposed to dangers which cannot be avoided by good navigation and seamanship. Whether a port is safe refers to the particular ship at issue, and goes beyond the immediate area of the port itself to the adjacent areas the vessel must traverse to either enter or leave. In other words, a port is unsafe—and in violation of the safe berth warranty—where the named ship cannot reach it without harm (absent abnormal conditions or those not avoidable by adequate navigation and seamanship).

*Id.* at 200 (quotations and citations omitted). "[T]he safe berth warranty is an express assurance made without regard to the amount of diligence taken by the charterer." *Id.* at 203. For our purposes, a safe berth warranty promises that a ship with a draft less than the warrantied depth is covered by the warranty in the absence of bad navigation or negligent seamanship.

Our prior opinion called for the District Court to resolve three issues on remand: the draft limit beyond which the safe berth warranty would not apply; the actual draft of the *Athos I* at the time of the allision; and whether

20

the warranty was negated by bad navigation or negligent seamanship. *Id.* at 204–05, 204 n.20.

As an initial matter, the District Court found that the safe berth warranty applied to ships drawing less than 37 feet, a finding neither party challenges on appeal. The remaining issues, then, are whether the *Athos I* had a draft of less than 37 feet, and if it did, whether bad navigation or negligent seamanship by Frescati negated the warranty.

### a. The Draft of the *Athos I*

The District Court found that the *Athos I* had a draft of 36′ 7″ at the time of the allision. The court based this finding on the undisputed draft of the *Athos I* at the time of its departure from Puerto Miranda—36′ 6″—as well as expert testimony regarding the condition of the ship and its estimated draft at Paulsboro.[9]

---

[9] Frescati's expert, Anthony Bowman, developed the Seamaster software program, which allows him to enter the measurements of a ship—including the weight, dimensions, and strength of all its constituent parts, such as the hull, cargo, and supplies—and calculate, among other things, a ship's draft. Having considered the ship's records, information about the ballast tanks, and his own software, Bowman testified that at the time of the allision,

CARCO challenges the District Court's determination of the *Athos I*'s draft, arguing that the District Court improperly based its finding on a speculative assumption about the orientation of the abandoned anchor. Specifically, CARCO disputes the District Court's finding that the anchor shifted from a flukes-down position to a flukes-up position sometime between 2001 and the allision in 2004, a shift that caused the anchor to intrude within the 37-foot safe depth promised by CARCO. CARCO argues that the District Court failed to make a finding as to the precise mechanism by which the anchor shifted from flukes-down to flukes-up. The anchor's orientation matters; if the accident occurred while the anchor was flukes-down, the *Athos I* necessarily would have had a draft that exceeded the scope of CARCO's warranty.[10]

---

the Athos I had a draft of 36′ 7″. The District Court credited his testimony.

[10] The District Court made undisputed findings of fact as to the height of the anchor in a flukes-down position (41 inches or 3.42 feet) and the depth of the river at the time and location of the allision (41.65 feet). Assuming for the moment that the anchor was flukes-down, as CARCO argues, the allision would not have occurred unless the *Athos I* had a draft of at least 38.23 feet, or just under

Broadly speaking, the District Court made three findings of fact related to the anchor's orientation. First, the court and parties agree that, three years before the allision, the anchor was in the flukes-down position.[11] Second, the District Court found that at some point before the allision, the anchor shifted into the flukes-up position. Finally, after the allision, the anchor was eventually discovered back in the flukes-down position—perhaps unsurprising, given the force of its encounter with the *Athos I*.

CARCO attacks the second finding, arguing that there was insufficient evidence in the record to support the District Court's suggestion that a "sweeping anchor chain" could have caught the anchor and shifted it into the flukes-up position.[12]

---

38′ 3″, significantly in excess of the warrantied draft of 37 feet.

[11] Experts for both sides were able to identify the flukes-down anchor in a sonar scan performed in 2001 as part of an independent geophysical study.

[12] Ships at anchor move with the tide, back and forth as the tide comes in and goes out. The anchor chain drags or "sweeps" across the riverbed as the ship floats, potentially shifting the position of objects on the riverbed, and leaving scour marks on the riverbed. Anchor chains also move

We find CARCO's arguments unconvincing, primarily because the "sweeping anchor chain" theory, however plausible or implausible, is not necessary to sustain the District Court's finding. Let us imagine a piece of furniture (a sofa, perhaps, or an armchair) that has fallen off the back of a pickup truck onto a roadway. One driver reports seeing the furniture in the right lane. A while later, a second driver hits the furniture. The second driver asserts that the furniture was in the left lane when he struck it, and provides evidence to that effect. A highway patrolman

---

along the river bottom when the anchor is pulled back onto the ship. CARCO, for its part, characterizes the idea that an anchor chain might have moved the abandoned anchor as "fantastical," "inexplicabl[e]," an "astonishing assertion," "facially implausible," "pure and wild speculation," "pure speculation," "conjecture," "speculative and unsupported," and, once again, "implausible." CARCO Opening Br. 4, 53–55; CARCO Reply Br. 32. The District Court pointed out that scour marks were found on the river bottom near the site of the allision, but ultimately decided only that the anchor was in the flukes-up position at the time of the allision. JA at 78 ("Although the actual cause of the anchor's movement to a 'flukes-up' position will never be known, the Court finds that at some point after December 2001, this movement occurred and the anchor was positioned in a 'flukes-up' orientation when it allided with the Athos I.").

shows up later and finds the furniture once again in the right lane. A court may find, without committing error, that the furniture was in the right lane and moved to the left without making a specific finding as to the precise method by which the furniture moved from one lane to the other. Perhaps another driver hit it; perhaps a pedestrian tried to move it out of the road but did not finish the job. When credible evidence shows that the second driver was driving in the left lane, a finding to that effect does not become error because the furniture was in the right lane when the first driver passed, or changed position after—or because of—the encounter with the second driver.

Here, the record contains sufficient evidence to support the finding that the anchor was, in fact, flukes-up at the time of the allision. How exactly the anchor changed position does not impact our sufficiency determination. As an initial matter, the movement of the *Athos I* at the time of the allision and the damage to its hull are sufficient to show that the anchor was flukes-up. And substantial evidence unrelated to the anchor showed that the *Athos I* was drawing 36′ 7″ at the time of the allision—a draft at which the allision would not have occurred had the anchor been flukes-down. That is enough to support the District Court's finding that the anchor moved from flukes-down to flukes-up.

The movement of the ship and damage to its hull shows that the anchor must have been flukes-up. The

District Court found that the *Athos I* was moving astern and to port at the time of the allision, a finding CARCO does not challenge. Based on that movement, the scoring left by the anchor on the hull, the size and shape of the two holes the anchor created, and the damage to the anchor itself also supported the District Court's finding that the anchor must have been flukes-up at the time of the allision. CARCO's own expert witness, on cross-examination, testified that if the *Athos I* were moving astern and to port, the damage to the *Athos I*'s hull would necessarily require a flukes-up anchor.[13] JA at 1021–22.

Nor did the District Court base its finding of a 36′ 7″ draft on the flukes-up anchor alone. While CARCO argues that the anchor was flukes-down, and that therefore the *Athos I* must have had a deep draft, the reverse is also true. If the *Athos I* had a draft of 36′ 7″, then the anchor must have been flukes-up. The District Court credited expert testimony that the ship had a 36′ 7″ draft. The ballast tanks contained no extra liquid that would have affected the ship's draft, a finding that CARCO does not challenge on appeal. The ship left Puerto Miranda with a draft of 36′ 6″. Visual observation of the ship by experts and crewmembers immediately after the allision suggested the *Athos I* had a 36′ 7″ draft before the allision. And, on

[13] CARCO's theory at trial, abandoned on appeal, was that the ship was *not* moving astern and to port.

26

appeal, CARCO fails to offer any suggestion as to how the draft might have increased by more than a foot without the crew's knowledge or any evidence that the ballast tanks were faulty.[14]

We conclude there was no clear error in the District Court's determination that the *Athos I* had a draft of 36′ 7″ at the time of the allision. The ship was, therefore, within the scope of CARCO's safe berth warranty.

### b. Frescati's Seamanship

A safe berth warranty applies only in the absence of bad navigation or negligent seamanship. CARCO argues on appeal that Frescati violated several maritime regulations related to the operation of single-hulled tankers, and that those regulatory violations serve as sufficient proof of negligent seamanship. The District Court concluded that Frescati did not violate any relevant regulations, and enforced the safe berth warranty. We

---

[14] The *Athos I* passed safely over a 38-foot shoal less than fifteen minutes before the allision. JA at 203. It seems that if the *Athos I* had a draft deep enough to hit the flukes-down anchor (a minimum of 38.23 feet, *see* supra note 10), it would have encountered the 38-foot shoal before it ever encountered the anchor. A flukes-down anchor would have been deeper than the 38-foot shoal even at the anchor's shallowest point. JA at 77, 78, 85.

agree with the District Court that Frescati did not violate any relevant regulations.

On appeal, CARCO argues specifically that Frescati violated two federal regulations: 33 C.F.R. § 157.455 and 33 C.F.R. § 164.11. Section 157.455 applied to certain single-hulled tankers during the period they were being phased out of operation, while § 164.11 applies to certain ships above 1,600 gross tons. 33 C.F.R. §§ 157.400, 164.01. Both sections applied to the *Athos I* at the time of the allision.

Section 157.455 requires the owner or operator of a single-hulled tanker to provide certain written guidance to the ship's master for purposes of estimating the tanker's underkeel clearance.[15] 33 C.F.R. § 157.455(a). It also

_____

[15] 33 C.F.R. § 157.455(a)–(b) reads:

>  (a) The owner or operator of a tankship, that is not fitted with a double bottom that covers the entire cargo tank length, shall provide the tankship master with written under-keel clearance guidance that includes—
>
>  >  (1) Factors to consider when calculating the ship's deepest navigational draft;

28

(2) Factors to consider when calculating the anticipated controlling depth;

(3) Consideration of weather or environmental conditions; and

(4) Conditions which mandate when the tankship owner or operator shall be contacted prior to port entry or getting underway; if no such conditions exist, the guidance must contain a statement to that effect.

(b) Prior to entering the port or place of destination and prior to getting underway, the master of a tankship that is not fitted with the double bottom that covers the entire cargo tank length shall plan the ship's passage using guidance issued under paragraph (a) of this section and estimate the anticipated under-keel clearance. The tankship master and the pilot shall discuss the ship's planned transit including the anticipated under-keel clearance. An entry must be made in the tankship's official log or in other

29

requires the master to use that guidance to plan the ship's passage, estimate the underkeel clearance, consult with the relevant pilots who will guide the ship to its berth, and make a log entry reflecting discussion of the ship's underkeel clearance with the pilot. 33 C.F.R. § 157.455(b). Section 164.11 mandates that the master ensure the pilot is informed of certain information, including the ship's draft and tidal conditions.[16] 33 C.F.R. § 164.11.

---

> onboard documentation reflecting discussion of the ship's anticipated passage.

33 C.F.R. § 157.455(a)–(b).

[16] 33 C.F.R. § 164.11 reads:

> The owner, master, or person in charge of each vessel underway shall ensure that:
>
> . . . .
>
> (k) If a pilot other than a member of the vessel's crew is employed, the pilot is informed of the draft, maneuvering characteristics, and peculiarities of the vessel and of any abnormal circumstances on the vessel that may affect its safe navigation.

CARCO argues that Frescati was responsible for three specific violations, each of which allegedly caused the allision. First, CARCO claims that Frescati failed to adequately plan the ship's passage. Second, CARCO claims that Frescati failed to estimate the *Athos I*'s underkeel clearance. Finally, CARCO claims that Frescati failed to ensure that an adequate master-pilot exchange occurred, and made no log entry that would reflect such an exchange.

With respect to planning the passage, CARCO argues that 33 C.F.R. § 157.455 requires a written voyage plan. Frescati allegedly violated that requirement by failing to finalize an official voyage plan document using the Tsakos Voyage Plan form contained in the Tsakos Vessel Operation Procedures Manual. *See* JA at 1178–85.

The text of § 157.455 undermines CARCO's argument. The regulation does not itself require a *written* voyage plan. Paragraph (a) of the regulation requires that Frescati create "written under-keel clearance guidance," which must contain "factors to consider" when evaluating

. . .

(n) Tidal state for the area to be transited is known by the person directing movement of the vessel . . . .

33 C.F.R. § 164.11.

31

draft, water depth, and weather conditions. Paragraph (b) requires that the master plan the ship's passage using those "factors to consider" in the guidance required by paragraph (a). Nowhere does this regulation require that the master's passage plan be in writing; the only reference to a writing in paragraph (b) comes in the requirement that some official log of the master-pilot conference be recorded. CARCO conflates the passage plan requirement of paragraph (b)—to consider certain relevant factors when planning—with the "Voyage Plan" form contained in Frescati's Vessel Operation Procedures Manual. *See* JA at 1180. The Voyage Plan form focuses on plotting the course of the vessel from berth to berth; paragraphs (a) and (b) of the regulation, on the other hand, serve to create a reference list for the ship's master of relevant factors to consider when estimating underkeel clearance.

Frescati satisfied the requirements of paragraph (a) by providing written underkeel clearance guidance in Section 3.4[17] of its Vessel Operation Procedures Manual. JA at 1191. The Manual appropriately lists factors to consider, including "sea state and swell," "tidal

_____

[17] The Vessel Operation Procedures Manual appears to contain a typographical error listing the appropriate section as 2.4 rather than 3.4, as it appears in the Table of Contents. *See* JA at 1189, 1191.

conditions," and "the effect of squat,"[18] and suggests to the master that 10% or 5% underkeel clearance margins would typically be appropriate. *Id.*

Furthermore, Frescati satisfied the planning requirement of paragraph (b) because the *Athos I*'s master, Captain Markoutsis, considered factors like the sea state, tidal condition, and the effect of squat. Even though CARCO provided a safe berth warranty for a draft up to 37 feet, Captain Markoutsis loaded the ship to only 36′ 6″ because he was "afraid" of a 37-foot draft, and eventually entered the Delaware River with a draft of 36′ 7″. *In re Frescati*, 718 F.3d at 204. The charts in the *Athos I* were marked with the 38-foot controlling draft in the anchorage. JA at 992. Captain Teal, the river pilot, testified that he and Captain Markoutsis discussed the draft, wind, visibility, and tides. We agree with the District Court that Frescati fully complied with the planning requirement of

---

[18] "Squat is a hydrodynamic phenomenon, which occurs when a ship is moving through the waters. As a ship moves forward, it displaces a volume of water. The displaced water rushes under the keel of the ship and creates a low pressure area causing the ship to sink down toward the riverbed. The faster a ship is moving, the more the ship will sink down towards the riverbed. This process causes a ship to be closer to the riverbed by increasing a vessel's draft." JA at 70 (citations omitted).

§ 157.455(b)—that is, to use the factors listed in the Vessel Operating Procedures Manual when planning the passage.

CARCO's second argument is that Frescati violated § 157.455(b) because Captain Markoutsis failed to estimate the *Athos I*'s underkeel clearance. The District Court did not err in finding that Captain Markoutsis had estimated underkeel clearance. Captain Markoutsis discussed the draft, tidal conditions, and anticipated underkeel clearance with Captain Teal. JA at 801–802. They estimated that the ship would have at least 1.5 meters' clearance—nearly five feet. *Id.* Captains Bethel and Markoutsis also discussed the draft and believed they would have sufficient clearance. JA at 833, 837. CARCO highlights that there is no evidence of *written* underkeel clearance estimates, but § 157.455 does not require written estimates.

Finally, CARCO argues that the master-pilot exchange required by § 157.455 and § 164.11 was inadequate. In general, master-pilot exchanges are intended to allow the master to share the navigational characteristics of his ship with the pilot who will be guiding it, and for the pilot to share local conditions such as weather, depth, and the tide with the master. Section 157.455(b) requires that "[t]he tankship master and the pilot shall discuss the ship's planned transit including the anticipated under-keel clearance. An entry must be made

34

in the tankship's official log or in other onboard documentation reflecting discussion of the ship's anticipated passage." 33 C.F.R. § 157.455(b). Section 164.11 requires that the master ensure that

> [i]f a pilot other than a member of the vessel's crew is employed, the pilot is informed of the draft, maneuvering characteristics, and peculiarities of the vessel and of any abnormal circumstances on the vessel that may affect its safe navigation. . . . [and that the] [t]idal state for the area to be transited is known by the person directing movement of the vessel.

33 C.F.R. § 164.11(k), (n).

Captain Markoutsis was responsible for discussing the draft, underkeel clearance, maneuvering characteristics, and tidal state with the two pilots who guided the *Athos I*. The testimony shows that Captain Markoutsis did so, discussing all the relevant information with both pilots, and that he recorded the conversation on the signed Pilot Card, which served as sufficient documentation of the master-pilot conference. The District Court additionally credited Frescati's expert witness, Captain Betz, who observed both Captain Teal and Captain Bethel testify. Captain Betz opined that the

35

master-pilot exchanges were adequate and customary in all respects.

Frescati operated the *Athos I* with neither bad navigation nor negligent seamanship. Nevertheless, the allision occurred. The District Court did not err in concluding that the allision resulted from a breach of CARCO's safe berth warranty.

## V.    Wharfinger Negligence

CARCO wore two hats in its dealings with Frescati, as a shipping customer and as a wharfinger. These dual roles exposed CARCO to liability under two independent legal theories. CARCO's first role, as a shipping customer that contracted with Frescati for delivery of a shipment of crude oil, resulted in CARCO's liability under the contractual safe berth warranty, discussed above. The second, as the wharfinger for the Paulsboro berth that was the *Athos I*'s intended destination, resulted in the District Court's finding of negligence and CARCO's corresponding liability in tort.

Both theories of liability independently support the District Court's judgment against CARCO. As a result, our decision to affirm the judgment based on CARCO's contractual liability means that we are not required to delve into the District Court's tort analysis. However, having reviewed that analysis, we harbor serious doubts

about the appropriateness of the court's proposed duty of care. For that reason, we are compelled to make clear that we will affirm the District Court's judgment based solely on CARCO's breach of contract.

A wharfinger's duty is more limited than that of a shipping customer who has provided a safe berth warranty. As we previously wrote:

> In the tort context, . . . a wharfinger is not a guarantor of a visiting ship's safety, but is bound to use reasonable diligence in ascertaining whether the berths themselves and the approaches to them are in an ordinary condition of safety for vessels coming to and lying at the wharf. This is not an unconstrained mandate to ensure safe surroundings or warn of hazards merely in the vicinity. Instead, a visiting ship may only expect that the owner of a wharf has afforded it a safe approach. In being invited to dock at a particular port, a vessel should be able to enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship.

*In re Frescati*, 718 F.3d at 207 (quotations and citations omitted). In short, and as a general matter, a wharfinger's

37

duty is to use reasonable diligence to ascertain whether the approach to its berth is safe for an invited vessel.[19]

We remanded for the District Court to determine in the first instance what reasonable diligence required of CARCO under the circumstances of this case, and whether CARCO breached that standard. *Id.* On remand, the District Court concluded that

> a reasonably prudent terminal operator should periodically scan the approach to its dock for hazards to navigation as long as ships are being invited there. In this case, the standard would require that side-scan sonar be used to search the approach for obstructions that are potential hazards to navigation. If an obstruction is located, a terminal operator is then required to remove it, and if the terminal operator cannot remove it, notice of the hazard must be given to

---

[19] We previously determined that the allision occurred in the approach to CARCO's berth—the geographic area within which a wharfinger's duty exists—and as a result, CARCO had a duty to use reasonable diligence to provide the *Athos I* with a safe approach. *In re Frescati*, 718 F.3d at 211.

> incoming ships by marking it as a hazard
> and/or warning ships of its presence.

JA at 132. Because CARCO did nothing to look for obstructions, the District Court held that it had breached its duty.

The District Court chose its standard by determining what the "demands of reasonableness and prudence" required. JA at 129. Citing Judge Learned Hand's famous formula from *United States v. Carroll Towing*, 159 F.2d 169 (2d Cir. 1947), the court concluded that the precaution of a preemptive side-scan sonar search would be less burdensome than the probability of an allision multiplied by the serious harm caused by a spill of toxic substances like crude oil.

We have doubts about the District Court's balancing of the cost of preventative measures on one hand and the cost of potential accidents on the other. The court found that a general scan of the approach to CARCO's berth and the berth itself would have cost between $7,500 and $11,000, and would have prevented the allision. Yet in this very case, the targeted scan of the area where the allision occurred, conducted only eight days after the allision, did not identify the anchor. The first set of 93 side-scan sonar passes conducted by Frescati's expert, John Fish—at a cost of $38,577—identified a pump casing on the river bottom. The anchor, however, went

39

unrecognized.[20] We do not share the District Court's confidence that a general $11,000 scan of the approach and berth would have "recognized" the anchor with sufficient clarity to prevent the allision, given that a targeted $38,000 scan for obstructions failed to do so.

Beyond the questionable utility of side-scan sonar as applied to this case, we doubt whether imposing a specific duty to require side-scan sonar would be useful for wharfingers in the ordinary course of their business. Single-hulled vessels like the *Athos I* present unique risks, and have been treated with special care by regulators. *See, e.g.*, 33 C.F.R. § 157.455. Today, as a result of those unique risks, such vessels are no longer permitted to operate in the waters of the United States. *See* 46 U.S.C. § 3703a (banning single-hulled oil tankers in the waters of the United States after January 1, 2015). Furthermore, side-scan sonar is not the only method available to detect and recognize obstructions, as the District Court pointed out.[21] Even if we were to accept the court's balancing of

---

[20] Fish testified that the side-scan sonar equipment "detected" the anchor, but neither he nor anyone else "recognized" it until after the second set of scans were taken. JA at 927.

[21] The court determined that CARCO should have used side-scan sonar to search for obstructions, but seemed willing to accept that other methods of searching for

cost, risk, and the magnitude of the potential harm, the high standard set forth in this case—involving a risky single-hulled vessel—would not necessarily apply to future cases, which will necessarily involve only double-hulled vessels.[22]

We are not unsympathetic to the position in which we placed the District Court by asking it to specify the duty of care at play in this case. The District Court has conscientiously complied. And we stand by our previous holding that CARCO had some duty to use reasonable diligence to provide the *Athos I* with a safe approach to its

---

obstructions might accomplish the same purpose. It noted that "side-scan sonar . . . is not the only method available in the industry to search for hazardous debris. . . . Since the standard of care involves factual issues, the methods may vary when the conditions in the approach to each terminal are examined." JA at 132 n.109.

[22] Indeed, five years after the *Athos I* allision, the Norwegian tanker *SKS Satilla*, carrying nearly 42 million gallons of crude oil, allided with a sunken oil rig in the Gulf of Mexico, sustaining "substantial damage to the port side of her hull." Findings of Fact and Conclusions of Law, *In re Ensco Offshore Co.*, No. 4:09-CV-2838, ECF No. 185 at 3, ¶¶ 6–7 (S.D. Tex. Sept. 30, 2014). But "[b]ecause the SATILLA [was] a double hulled vessel[,] . . . there was no discharge of crude oil." *Id.* at 3, ¶ 9.

berth—a duty it may or may not have breached. *In re Frescati*, 718 F.3d at 211. Nevertheless, given CARCO's independent liability in contract and our decision to affirm on that basis, we will once again decline to outline precisely what CARCO's duty of reasonable diligence entailed.

## VI.  Subrogation and Equitable Recoupment

This litigation does not implicate the interests of only Frescati and CARCO. The United States reimbursed Frescati for $88 million in cleanup expenses above the liability limit established by the OPA. Consequently, the United States became subrogated to Frescati's claims, and joined the fray by filing suit against CARCO in 2008.[23]

---

[23] The United States and CARCO reached a partial settlement agreement before the first trial. Both the United States and CARCO agreed to forgo any negligence claims they might have had against one another. The parties agreed that the United States would pursue only its contract claim against CARCO. As a result, the United States' judgment against CARCO was based solely on CARCO's contractual liability under the safe berth warranty. CARCO, for its part, reserved in the settlement agreement

> each and every substantive and procedural right available to a defendant . . . including

Frescati initially paid for the oil spill cleanup costs as a "responsible party" under the OPA. *See* 33 U.S.C. § 2702(a). The OPA allows a responsible party like Frescati to limit its liability to a specified sum; any cleanup costs above that amount are reimbursed out of the Oil Spill Liability Trust Fund.[24] *See* 33 U.S.C. § 2704. Under this

_____

> but not limited to the right to raise affirmative defenses under any theory or doctrine of law or equity, the right to assert setoff or recoupment and the right to assert compulsory or non-compulsory counterclaims other than a Claim for Contribution or Indemnity . . . .

JA at 391.

[24] The Oil Spill Liability Trust Fund, administered by the Coast Guard, serves much like insurance for the oil transportation industry. Companies that import oil into the United States pay a per-barrel fee into the Trust Fund. When a tanker vessel spills oil, the OPA assigns liability for the cleanup to a "responsible party"—typically the owner of the vessel from which the oil spilled. The responsible party is liable for all cleanup costs associated with the spill. If the costs exceed a liability cap established by the OPA, the Trust Fund reimburses the responsible party for all expenses above the statutory cap. Liability under the OPA does not preclude a responsible party from

scheme, Frescati's liability for the cost of the oil spill cleanup was limited to approximately $45 million. The Trust Fund reimbursed Frescati for its remaining cleanup costs, which totaled approximately $88 million. The United States then became statutorily "subrogated to all rights, claims, and causes of action that the claimant [Frescati] has under any other law." 33 U.S.C. § 2715(a). The United States pursued these claims against CARCO as a "person who is liable, pursuant to any law, to the compensated claimant [Frescati] or to the Fund, for the cost or damages for which the compensation was paid." 33 U.S.C. § 2715(c).

Pursuant to the partial settlement agreement, the United States limited itself to the same contractual claims Frescati asserted. Because CARCO was liable to Frescati in contract, it was also liable to the United States for the amount the Trust Fund had reimbursed Frescati: nearly $88 million. But CARCO asserted a defense against the United States it did not assert against Frescati—equitable

---

bringing any claims it has against a third party under any other law. The United States, to the extent the Trust Fund has reimbursed the responsible party's costs, steps into the shoes of the responsible party as subrogee and may pursue claims against a third party as if it were the responsible party. Any recovery won by the United States is returned to the Trust Fund to cover future oil spill reimbursements.

recoupment—and in response, the District Court reduced the United States' judgment by 50%. Both CARCO and the United States appealed. CARCO argues that the District Court erred by not eliminating the United States' recovery, while the United States argues that the District Court should have left the contract judgment untouched and denied CARCO any equitable remedy. We conclude that the District Court erred by reducing the United States' judgment by 50%. The United States is entitled to a full recovery.

### a. Subrogation and Subrogee-Specific Defenses

As an initial matter, we note that the dispute between CARCO and the United States presents an unusual question about the nature of subrogation. Subrogation itself is not unusual; in general terms, it "simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party." *US Airways v. McCutchen*, 569 U.S. 88, 97 n.5 (2013). Most often, it arises in the insurance context as a procedural mechanism to allow an insurer (the subrogee) to step into the shoes of its insured (the subrogor) after it has compensated the insured for harm caused by a third party. The subrogee, having stepped into the shoes of the subrogor, is entitled to assert all of the subrogor's rights and claims against the responsible third party. Likewise,

45

the third party—now defending an action brought by the subrogee—is entitled to assert every defense it otherwise could have raised against the subrogor. In that vein, the third party's liability to a subrogee cannot be greater than it would have been to the subrogor. Restatement (Third) of Restitution & Unjust Enrichment § 24.

All that is unexceptional. The unusual question presented here is whether a third party may assert a defense against a subrogee that it could *not* assert against the subrogor. As we discussed above, CARCO is liable to Frescati, the subrogor, in contract. Consequently, CARCO is liable to the United States, the subrogee, under that very same contract. But CARCO wishes to assert a defense against the United States—namely, that equitable recoupment requires the United States to bear the loss rather than CARCO because of the allegedly misleading conduct of three federal agencies—that it could not assert against Frescati.

The United States makes a related argument. Its position is that the equitable recoupment defense, predicated as it is on the conduct of federal agencies rather than the contractual relationship between Frescati and the United States, violates the statutory subrogation provision of the OPA. Specifically, the United States argues that it is entitled to "all [of Frescati's] rights, claims, and causes of action" under the OPA. 33 U.S.C. § 2715(a). Frescati's contractual right is not limited by CARCO's claims

46

against the Coast Guard, NOAA, and the Army Corps of Engineers; the United States asserting Frescati's contractual right should also not be so limited, and to do otherwise would infringe on the United States' statutory entitlement. When Frescati has the right to a full recovery under its contract, the argument goes, so does the United States.

We agree. CARCO may only assert defenses against the United States' subrogated claims which it could have asserted against Frescati—including any equitable recoupment defense it could have asserted against Frescati. In its capacity as a subrogee, the United States should be subject to the same treatment as Frescati. Just as the United States, as subrogee, may only assert Frescati's claims, CARCO, as defendant, is not entitled to extra defenses because the United States asserts Frescati's claims rather than Frescati itself. Of course, no party is exempt from the Federal Rules of Civil Procedure. The United States is subject to the ordinary procedural rules governing counterclaims and third-party complaints, and the OPA does not bar CARCO from asserting whatever claims it has against the United States using those recognized procedural mechanisms where appropriate.[25]

---

[25] This issue is complicated by the fact that the specific defense asserted by CARCO, equitable recoupment, is sometimes pleaded as a defense, and sometimes as a

In this case, the only claim asserted by the United States is Frescati's contract claim. *In re Frescati*, 718 F.3d at 189; JA at 390. It follows that CARCO's equitable recoupment defense must be directed toward the United States' contract claim. *See* 718 F.3d at 214 (declining to preclude CARCO from raising "equitable defense[s] to the Government's subrogation claims"). If CARCO had other cognizable claims against the three federal agencies involved in regulating the Delaware River and the anchorage, sounding in tort or otherwise, it was free to assert them in a third-party complaint or counterclaim, just as the United States was free to pursue other claims against CARCO.[26] In that light, we proceed to analyze CARCO's

---

counterclaim. We do not mean to imply that CARCO should have pleaded equitable recoupment as a counterclaim rather than a defense. However it is pleaded, "recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded," and here, the plaintiff's action is grounded in Frescati's contractual right. *Bull v. United States*, 295 U.S. 247, 262 (1935). To the extent CARCO had cognizable claims against the Coast Guard, NOAA, and the Army Corps of Engineers, it should have asserted those claims directly, rather than as a defense to Frescati's now-subrogated contract claim.

[26] CARCO was also free to waive its claims against the United States, and vice versa. Indeed, both CARCO and

48

equitable recoupment defense as it applies to the United States' contractual rights.

### b. Equitable Recoupment

Equitable recoupment is a "principle that diminishes a party's right to recover a debt to the extent that the party holds money or property of the debtor to which the party has no right."[27] *In re Frescati*, 718 F.3d at

---

the United States waived certain rights in the 2009 partial settlement agreement, including CARCO's waivers of the rights to bring a "Claim for Contribution or Indemnity . . . whether based on principles of common law, contract, quasi-contract or tort," and "demand that the court reduce or offset the damages awarded to the United States . . . based on evidence that the negligence or fault of the United States in failing to detect, mark and/or remove underwater obstructions to navigation . . . caused or contributed to the ATHOS I Incident." JA at 389. At an earlier stage in the litigation, the United States argued that CARCO's equitable recoupment defense amounted to a violation of the settlement agreement. The United States eventually waived that argument by failing to raise it at the first trial, and so we need not consider it today. *In re Frescati*, 718 F.3d at 214.

[27] A classic example of recoupment is a situation in which the statute of limitations is different for two related claims

214 n.35. For an equitable recoupment defense to succeed, the defendant must possess a claim against the plaintiff arising from the same transaction or occurrence as the plaintiff's suit, seeking relief of the same kind as that sought by the plaintiff, in an amount no greater than that

arising out of the same transaction—when, for example, the statute of limitations period during which the United States may file a claim against a taxpayer for underpayment of the income tax is longer than the period during which a taxpayer may file a claim for a refund of overpayment of the estate tax. The taxpayer (in this case, the estate of a decedent) pays the estate tax and final year's income tax. Sometime later, after the statute of limitations has run on the estate tax overpayment but not the income tax underpayment, the government claims the taxpayer owes additional income tax for the taxpayer's final year. Due to the increased income tax liability for the year, the taxpayer now owes less in estate tax—but the statute of limitations has already run, and the taxpayer cannot amend the estate tax return. In an action brought by the government to recover the extra income tax owed, the taxpayer may assert an equitable recoupment defense for the amount of the overpayment of the estate tax, even though the statute of limitations has run and the taxpayer would not otherwise have been able to recover the overpayment. *See generally Bull v. United States*, 295 U.S. 247 (1935).

sought by the plaintiff. *See Livera v. First Nat'l State Bank of New Jersey*, 879 F.2d 1186, 1195 (3d Cir. 1989).

CARCO's equitable recoupment defense faces at least two serious obstacles. As an initial matter, the United States questions whether CARCO possesses a "claim" against it, rather than a generalized request for the court to balance the equities. Second, the United States questions whether CARCO seeks relief of the same kind as the United States. On both points, CARCO fails to meet its burden.

CARCO's claim, such as it is, appears to be that the equities favor CARCO, and require the United States to bear the cost of the spill. CARCO argues that the United States, through the Coast Guard, NOAA, and the Army Corps of Engineers, had responsibility for maintaining the anchorage where the allision occurred free of obstructions. In the alternative, if the agencies were not responsible to preemptively search for obstructions, CARCO argues they should have more explicitly made clear that they were not conducting such searches. CARCO asserts that it reasonably believed, based on the agencies' conduct, that the agencies were maintaining the anchorage free of obstructions. Additionally, CARCO argues that equity

51

requires the Oil Spill Liability Trust Fund to bear the cost of the cleanup rather than CARCO.[28]

---

[28] Though it is not necessary to our holding, we note that these equities do not appear to favor CARCO. As to agency regulation and maintenance of the anchorage where the allision occurred, the District Court held that the agencies did not have a duty to maintain the anchorage free of obstructions. The United States does not preemptively search for obstructions in the anchorage, it is not responsible for doing so, and it did not tell CARCO that it would do so. To the extent CARCO believed otherwise, CARCO simply misunderstood the regulatory structure and the responsibilities (and indeed, the capabilities) of the agencies.

Additionally, to the extent—if at all—that the Coast Guard, NOAA, and the Army Corps of Engineers were responsible for the *Athos I* oil spill, reducing the recovery of the United States in this case would not be equitable. Beyond our concerns relating to subrogation (equity would certainly not favor reducing Frescati's recovery under these circumstances), such a decision would impose liability on the Oil Spill Liability Trust Fund, not the responsible agencies. Any recovery based on the United States' subrogated claim flows back to the Trust Fund, out of which the United States originally reimbursed Frescati. 26 U.S.C. § 9509(b)(3). The Trust Fund is not intended (or

Equitable recoupment requires more than just a request to balance the equities. CARCO points out that although equitable recoupment most often arises in the context of offsetting monetary claims, as in tax or bankruptcy cases, it is not necessarily limited to those situations. *See, e.g.*, *Oneida Indian Nation of New York v.*

---

allowed by statute) to be used as a slush fund to cover the liabilities of federal agencies. *See* 33 U.S.C. § 2712 ("Uses of the Fund").

As a final point, the purpose of the Trust Fund is not to absorb the cost of cleaning up oil spills; indeed, almost the opposite is true. The OPA creates a strict liability regime for responsible parties, while capping that liability at a set amount. But the Trust Fund was not designed to bear those costs indefinitely; the subrogation provision of 33 U.S.C. § 2715 allows the United States, on behalf of the Trust Fund, to pursue any claim a responsible party could have brought against a third party under any law, in order to recover the money paid out by the Trust Fund and preserve the Trust Fund's ability to respond quickly to spills in the future. The OPA is intended to quickly compensate victims of spills, minimize environmental damage, and internalize the costs of oil spills within the oil industry. The subrogation provision serves those purposes by letting cleanup costs fall upon the liable party, rather than with the Trust Fund.

*New York*, 194 F. Supp. 2d 104, 136–37 (N.D.N.Y. 2002) (allowing an equitable recoupment defense in the context of offsetting requests for declaratory judgments in a land rights case). But CARCO still must assert some cognizable claim, rather than simply a request for the Court to reduce the United States' damages in the interest of equity. Here, CARCO has failed to do so.

Neither does CARCO seek the same kind of relief as the United States. The United States seeks contractual relief, to which it is entitled by operation of statute. *See* 33 U.S.C. § 2715. CARCO, by contrast, seeks equitable relief, or (on another reading) essentially tort-based relief grounded in misrepresentation by the agencies. The mismatched relief sought by CARCO and the United States does not support CARCO's equitable recoupment defense.

The requirement that a defendant seek the same kind of relief as has been sought in the plaintiff's claim is a fundamental requisite for recoupment. The defense is not intended to be a catch-all to allow any claims otherwise barred by time, settlement, or statute to be heard as equity seems to require. Equitable recoupment is intended to allow only truly similar claims arising from the same transaction to offset one another in the interest of equity between the parties. As noted, equitable recoupment is well-suited for disputes in which two claims arise out of the same taxable event or the same contractual obligation,

54

as often seen in tax or bankruptcy cases. When, as here, the plaintiff seeks relief on a contract, the defendant may not resort to equitable recoupment as a means to assert a non-contractual claim, whether sounding in an equitable-balancing analysis, in tort, or otherwise.

CARCO has failed to meet its burden of establishing an equitable recoupment defense. It is liable to the United States in full.

## VII. Limitation of Liability under the Oil Pollution Act

CARCO argues that a provision of the OPA, 33 U.S.C. § 2702(d)(2)(B), limits its liability in this case to the same extent to which Frescati's liability was limited—approximately $45 million. Because CARCO did not raise this defense with the requisite clarity until nearly ten years after this litigation began, the District Court concluded that CARCO waived it. We agree that the defense was waived.

A District Court's holding that an affirmative defense has been waived is reviewed for abuse of discretion. *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 506 (3d Cir. 2006). Waiver is appropriate if the party raising the defense did not do so at a "pragmatically sufficient time" and if the opposing party would be prejudiced if the defense were allowed. *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991).

55

Whether CARCO raised its defense at a pragmatically sufficient time requires us to determine *when* CARCO first raised the § 2702(d)(2)(B) defense. CARCO argues that it first raised the limitation defense in its 2005 answer to Frescati's Amended Counterclaim by referring to the OPA. The District Court concluded that CARCO's answer contained nothing that would have put Frescati or the United States on notice that CARCO planned to rely on a limitation of liability defense. In general, "[a]n affirmative defense . . . 'need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of [Fed. R. Civ. P. 8] by its bare assertion.'" *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218 (3d Cir. 2017) (quoting *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 361 (8th Cir. 1997)). Nevertheless, the party asserting the defense must actually do so, and in a way that gives fair notice of that defense.

CARCO relies on the averment listed as its "Seventh Separate Defense," which reads simply: "The claims and causes of action set forth in the plaintiffs' Amended Counterclaim are barred in whole or in part by the provisions of the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq." JA at 355. Noticeably absent from this general averment is any specific citation to the limitation of liability defense or even a description of the nature of the defense. This is significant, because the OPA includes a number of potential affirmative defenses. *See, e.g.*, 33

56

U.S.C. § 2702(b) (limiting scope of damages for which the OPA imposes liability); § 2702(c) (excluding certain oil spills from OPA liability); § 2702(d)(1)(A) (shifting liability under the OPA to a solely responsible third party); § 2702(d)(2) (limiting the liability of certain parties under the OPA); § 2703 ("Defenses to liability"). CARCO's general reference to the entirety of the OPA did not provide adequate information from which Frescati could determine that CARCO was seeking to limit its liability under § 2702(d)(2)(B). Nor did CARCO develop this defense at any point before the first trial. For that reason, CARCO's unspecified reference to the OPA did not provide the requisite fair notice to Frescati.

Furthermore, Frescati would be prejudiced if the defense were allowed. As the District Court found, if CARCO had asserted its defense in a timely fashion, fifteen days of depositions and trial testimony from seven witnesses could have been avoided, along with the OPA damages phase of the first trial.[29]

---

[29] Allowing CARCO to assert the defense after failing to raise it at a practicable time wastes the District Court's resources as well.

> Affirmative defenses must be raised as early as practicable, not only to avoid prejudice, but also to promote judicial economy. If a

57

CARCO did not clearly assert the limitation defense until nearly a decade after this action commenced, and over a year after the first trial and appeal had concluded. The District Court appropriately concluded that CARCO had not raised the defense at a pragmatically sufficient time, and that Frescati would be prejudiced if the defense were allowed. The District Court did not abuse its discretion in finding the defense waived.[30]

## VIII.    Prejudgment Interest Rate

The District Court awarded Frescati prejudgment interest of just over $16 million. Frescati, in its cross-appeal from the District Court's judgment, argues that the District Court erred by using the federal postjudgment

---

party has a successful affirmative defense, raising that defense as early as possible, and permitting a court to rule on it, may terminate the proceedings at that point without wasting precious legal and judicial resources.

*Robinson v. Johnson*, 313 F.3d 128, 137 (3d Cir. 2002).

[30] It is worth noting that the United States similarly waived a defense by its failure to raise an argument in the first trial. We previously held that the United States waived its right to object to CARCO's equitable recoupment defense on the basis that it violated the terms of the partial settlement agreement. *In re Frescati*, 718 F.3d at 214.

interest rate set by 28 U.S.C. § 1961(a) to determine the amount of the prejudgment interest award. Specifically, Frescati argues that the District Court improperly believed itself bound to use the federal postjudgment rate rather than the higher U.S. prime rate because Frescati did not present evidence of its borrowing costs.

An award of prejudgment interest is reviewed for abuse of discretion. *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 981–82 (3d Cir. 1984); *see also Sun Ship, Inc. v. Matson Nav. Co.*, 785 F.2d 59, 63 (3d Cir. 1986). When selecting an interest rate, the District Court must keep in mind that the rate and corresponding award "must be compensatory rather than punitive." *Del. River & Bay Auth. v. Kopacz*, 584 F.3d 622, 634 (3d Cir. 2009).

Here, the District Court awarded Frescati prejudgment interest at the one-year Treasury rate—the same rate used as the federal postjudgment interest rate. *See* 28 U.S.C. § 1961(a). Importantly, the District Court found that the postjudgment rate would "fairly and adequately compensate Frescati for its losses." JA at 183.

Frescati argues that, in the absence of evidence of borrowing costs, we should require the use of the U.S. prime rate. We grant that, had the District Court chosen to use the prime rate, it would not have abused its discretion even without extensive proof of borrowing costs. *Taxman*

59

*v. Bd. of Educ.*, 91 F.3d 1547, 1566 (3d Cir. 1996) (en banc). Indeed, the prime rate is commonly used to approximate the cost the defendant would have paid to borrow in the market, and at least one court appears to require it. *See, e.g.*, *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431 (7th Cir. 1989) (requiring use of the prime rate in certain circumstances); *see also Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996) ("[T]he prime rate is not merely *as* appropriate as the Treasury Bill rate, but *more* appropriate . . . ."). In this Circuit, however, a district court is not constrained to the use of only the prime rate: "[i]n exercising [its] discretion, . . . the court may be guided by the rate set out in 28 U.S.C. § 1961." *Sun Ship*, 785 F.2d at 63; *Taxman*, 91 F.3d at 1566 ("[A] court 'may' use the post-judgment standards of 28 U.S.C. § 1961(a) [to calculate prejudgment interest, though] it is not compelled to do so.").[31]

The District Court determined that the federal postjudgment rate "fairly and adequately compensate[s]

---

[31] Nor was it an abuse of discretion for the District Court to adopt a variable interest rate. Interest accumulated for more than a decade, and during that time prevailing interest rates changed substantially.

Frescati for its losses." JA at 183. Under our Court's precedent, the District Court acted within its discretion.

## IX. Conclusion

The District Court's order dated August 17, 2016 will be affirmed in part, vacated in part, and reversed in part. The District Court's judgment in favor of Frescati on the breach of contract claim and the prejudgment interest award will be affirmed. The District Court's judgment in favor of Frescati on the negligence claim will be vacated. The District Court's judgment in favor of the United States will be affirmed in part with respect to CARCO's liability on the subrogated breach of contract claim, but the judgment will be reversed and remanded for further proceedings in light of our equitable recoupment ruling for the purpose of recalculating damages and prejudgment interest. The District Court's order dated April 9, 2015, denying CARCO's motion for partial summary judgment on its limitation of liability defense, will be affirmed.