(Slip Opinion) OCTOBER TERM, 2019 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITGO ASPHALT REFINING CO. ET AL. *v.* FRESCATI SHIPPING CO., LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 18–565. Argued November 5, 2019—Decided March 30, 2020

Petitioners (collectively CARCO) sub-chartered the oil tanker M/T *Athos I* from tanker operator Star Tankers, which had chartered the tanker from respondent Frescati Shipping Company. In the final stretch of the tanker's journey from Venezuela to New Jersey, an abandoned ship anchor punctured the tanker's hull, causing 264,000 gallons of heavy crude oil to spill into the Delaware River. The Oil Pollution Act of 1990, 33 U. S. C. §2702(a), required Frescati, the vessel's owner, to cover the cleanup costs in the first instance. Pursuant to the statute, Frescati's liability was limited to $45 million, and the Oil Spill Liability Trust Fund, operated by the Federal Government (also a respondent here), reimbursed Frescati for an additional $88 million in cleanup costs.

Frescati and the United States then sued CARCO to recover their respective portions of the cleanup costs. Both alleged that CARCO was ultimately at fault for the oil spill because CARCO had breached a contractual "safe-berth clause" in the subcharter agreement ("charter party") between CARCO and Star Tankers. According to Frescati and the United States, that clause obligated CARCO to select a "safe" berth that would allow the vessel to come and go "always safely afloat," and that obligation amounted to a warranty regarding the safety of the selected berth. After concluding that Frescati was an implied third-party beneficiary of the safe-berth clause, the Third Circuit held that the clause embodied an express warranty of safety made without regard to the charterer's diligence in selecting the berth.

*Held*: The plain language of the parties' safe-berth clause establishes a warranty of safety. Pp. 5–16.

(a) The Court's analysis begins and ends with the text of the safe-

berth clause. As CARCO acknowledges, the clause imposes on the charterer a duty to select a safe berth. And given the unqualified language of the clause, the charterer's duty is absolute: The charterer must designate a berth that is "safe" and that allows the vessel to come and go "always" safely afloat. That absolute duty amounts to a warranty of safety.

That the safe-berth clause does not expressly invoke the term "warranty" does not alter the charterer's duty under the safe-berth clause. It is well settled that statements of material fact in a charter party are warranties, regardless of their label. See, *e.g.*, *Davison* v. *Von Lingen,* 113 U. S. 40, 49–50. Here, it is plain on the face of the contract that the safe-berth clause sets forth a statement of "material" fact regarding the condition of the berth selected by the charterer. The charterer's assurance of a safe berth is the entire root of the safe-berth clause, and crucially, it is not subject to qualifications or conditions.

CARCO counters that the safe-berth clause merely imposes a duty of due diligence in selecting a safe berth. But as a general rule, tort concepts like due diligence have no place in contract analysis. Under basic precepts of contract law, an obligor is strictly liable for a breach of contract, without regard to fault or diligence. While parties are free to contract for limitations on liability, the parties here contracted for no such thing: There is no language in the safe-berth clause even hinting at due diligence. That omission is particularly notable in context, as the parties expressly contracted for due-diligence limitations on liability elsewhere in the charter party.

CARCO's arguments about other clauses in the charter party do not counsel in favor of a different result. The charter party's "general exceptions clause," which limits the charterer's liability for losses due to "perils of the seas," does not apply where, as here, another clause expressly provides for liability stemming from the designation of an unsafe berth. Nor does a clause requiring Star Tankers to obtain oil-pollution insurance relieve CARCO of liability under the safe-berth clause. The pollution-insurance clause covers risks beyond those resulting from the selection of an unsafe berth.

CARCO's alternative interpretation of the safe-berth clause, as simply requiring the charterer to pay any expenses resulting from the vessel master's refusal to enter an unsafe berth, is inapposite. Assuming that the charterer is liable for expenses when the vessel master justifiably refuses to enter an unsafe berth, that does not abate the scope of the charterer's liability when a vessel in fact enters an unsafe berth.

The dissent argues that reading the safe-berth clause to bind the charterer to a warranty of safety would necessarily imply that the safe-berth clause creates contradictory warranties of safety, one on the

charterer and one on the vessel master. Because that conflict cannot be, the dissent continues, the safe-berth clause must not bind the charterer to a warranty of safety. The dissent's conclusion does not follow because the alleged conflict does not exist. Under the safe-berth clause, the charterer has a duty to select a safe berth, while the vessel master has a duty to load and discharge at the chosen safe berth. There is no tension between those two duties. Pp. 5–12.

(b) CARCO's arguments that other authorities have understood safe-berth clauses differently lack foothold in the text of the safe-berth clause and are otherwise unconvincing. For instance, CARCO relies on a leading admiralty treatise that urges that safe-berth clauses ought not be interpreted as establishing a warranty of safety because charterers are not always in the best position to know the dangers attendant to a given berth. But whatever that treatise sought to prevail upon courts to adopt as a prescriptive matter does not alter the plain meaning of the safe-berth clause here.

Also unavailing is CARCO's contention that *Atkins* v. *Disintegrating Co.,* 18 Wall. 272, determined that safe-berth clauses do not embody a warranty of safety. CARCO relies on a passing statement in *Atkins* that did not bear on this Court's ultimate holding that the vessel master in that case had waived the protection of the safe-berth clause.

Finally, CARCO points out that the Fifth Circuit has held that a similarly unqualified safe-berth clause merely imposed a duty of due diligence. *Orduna S. A.* v. *Zen-Noh Grain Corp.*, 913 F. 2d 1149. But the Fifth Circuit did not purport to interpret the language of the safe-berth clause at issue in that case and instead relied principally on tort law and policy considerations. The Second Circuit's long line of decisions interpreting the language of unqualified safe-berth clauses as embodying an express warranty of safety is more consistent with traditional contract analysis. See, *e.g.*, *Paragon Oil Co.* v. *Republic Tankers, S. A.*, 310 F. 2d 169. Pp. 12–16.

886 F. 3d 291, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–565

_____

## CITGO ASPHALT REFINING COMPANY, ET AL., PETITIONERS *v.* FRESCATI SHIPPING COMPANY, LTD., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[March 30, 2020]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In 2004, the M/T *Athos I*, a 748-foot oil tanker, allided[1] with a nine-ton anchor abandoned on the bed of the Delaware River. The anchor punctured the tanker's hull, causing 264,000 gallons of heavy crude oil to spill into the river. As required by federal statute, respondents Frescati Shipping Company—the *Athos I*'s owner—and the United States covered the costs of cleanup. They then sought to reclaim those costs from petitioners CITGO Asphalt Refining Company and others (collectively CARCO), which had chartered the *Athos I* for the voyage that occasioned the oil spill. According to Frescati and the United States, CARCO had breached a contractual "safe-berth clause" obligating CARCO to select a "safe" berth that would allow the *Athos I* to come and go "always safely afloat."

The question before us is whether the safe-berth clause is a warranty of safety, imposing liability for an unsafe berth

_____

[1] An allision is "[t]he contact of a vessel with a stationary object such as an anchored vessel or a pier." Black's Law Dictionary 94 (11th ed. 2019).

regardless of CARCO's diligence in selecting the berth.  We hold that it is.

## I

## A

During the relevant period, the *Athos I* was the subject of a series of contracts involving three parties: Frescati, Star Tankers, and CARCO.  Frescati owned the *Athos I.*  Star Tankers, an operator of tanker vessels, contracted with Frescati to charter the *Athos I* for a period of time.  CARCO then contracted with Star Tankers to subcharter the *Athos I* for the inauspicious voyage resulting in the oil spill.

Pertinent here is the subcharter agreement between Star Tankers and CARCO.  In admiralty, such contracts to charter a vessel are termed "charter parties."  Like many modern charter parties, the agreement between Star Tankers and CARCO was based on a standard industry form contract.  It drew essentially verbatim from a widely used template known as the ASBATANKVOY form, named after the Association of Ship Brokers & Agents (USA) Inc. (ASBA) trade association that publishes it.

At the core of the parties' dispute is a clause in the charter party requiring the charterer, CARCO, to designate a safe berth at which the vessel may load and discharge cargo.  This provision, a standard feature of many charter parties, is customarily known as a safe-berth clause.  The safe-berth clause here provides, as relevant, that "[t]he vessel shall load and discharge at any safe place or wharf, . . . which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer."  Addendum to

Brief for Petitioners 8a.[2]  The charter party separately re-
quires CARCO to direct the *Athos I* to a "safe por[t]" along
the Atlantic seaboard of the United States.  *Id.*, at 24a.

Pursuant to the charter party, CARCO designated as the
berth of discharge its asphalt refinery in Paulsboro, New
Jersey, on the shore of the Delaware River.  In November
2004, the *Athos I* set out on a 1,900-mile journey from
Puerto Miranda, Venezuela, to Paulsboro, New Jersey, car-
rying a load of heavy crude oil.  The vessel was in the final
900-foot stretch of its journey when an abandoned ship an-
chor in the Delaware River pierced two holes in the vessel's
hull.  Much of the *Athos I*'s freight drained into the river.

B

After the Exxon-Valdez oil spill in 1989, Congress passed
the Oil Pollution Act of 1990 (OPA), 104 Stat. 484, 33
U. S. C. §2701 *et seq.*, to promote the prompt cleanup of oil
spills.  To that end, OPA deems certain entities responsible
for the costs of oil-spill cleanups, regardless of fault.
§2702(a).  It then limits the liability of such "responsible
part[ies]" if they (among other things) timely assist with
cleanup efforts.  §2704.  Responsible parties that comply
with the statutory conditions receive a reimbursement from
the Oil Spill Liability Trust Fund (Fund), operated by the
Federal Government, for any cleanup costs exceeding a
statutory limit.  §2708; see also §2704.

Although a statutorily responsible party must pay
cleanup costs without regard to fault, it may pursue legal

————————
[2] The parties agree that the safe-berth clause also encompasses what
is often referred to as a "safe-port clause."  The safe-port clause here pro-
vides that "[t]he vessel . . . shall, with all convenient dispatch, proceed as
ordered to Loading Port(s) named . . . , or so near thereunto as she may
safely get (always afloat), . . . and being so loaded shall forthwith pro-
ceed, . . . direct to the Discharging Port[s], or so near thereunto as she
may safely get (always afloat), and deliver said cargo."  Addendum to
Brief for Petitioners 4a.  The parties do not dispute that the two clauses
should be read in conjunction.

claims against any entity allegedly at fault for an oil spill. §§2710, 2751(e). So may the Fund: By reimbursing a responsible party, the Fund becomes subrogated to the responsible party's rights (up to the amount reimbursed to the responsible party) against any third party allegedly at fault for the incident. §§2712(f), 2715(a).

As owner of the *Athos I*, Frescati was deemed a "responsible party" for the oil spill under OPA. Frescati worked with the U. S. Coast Guard in cleanup efforts and covered the costs of the cleanup. As a result, Frescati's liability was statutorily limited to $45 million, and the Fund reimbursed Frescati for an additional $88 million that Frescati paid in cleanup costs.

## C

Following the cleanup, Frescati and the United States each sought recovery against CARCO: Frescati sought to recover the cleanup costs not reimbursed by the Fund, while the United States sought to recover the amount disbursed by the Fund. As relevant here, both Frescati and the United States claimed that CARCO had breached the safe-berth clause by failing to designate a safe berth, and thus was at fault for the spill.

After a complicated series of proceedings—including a 41-day trial, a subsequent 31-day evidentiary hearing, and two appeals—the Court of Appeals for the Third Circuit found for Frescati and the United States. The court first concluded that Frescati was an implied third-party beneficiary of the safe-berth clause in the charter party between CARCO and Star Tankers, thereby allowing the breach-of-contract claims by Frescati and the United States to proceed against CARCO. *In re Frescati Shipping Co.*, 718 F. 3d 184, 200 (2013). The court then held that the safe-berth clause embodied an express warranty of safety "made without regard to the amount of diligence taken by the charterer," and that CARCO was liable to Frescati and the

United States for breaching that warranty. *Id.*, at 203; *In re Frescati Shipping Co.*, 886 F. 3d 291, 300, 315 (2018) (case below).

We granted certiorari, 587 U. S. \_\_\_ (2019), to resolve whether the safe-berth clause at issue here merely imposes a duty of diligence, as the Fifth Circuit has held in a similar case, or establishes a warranty of safety, as the Second Circuit has held in other analogous cases. Compare *Orduna S. A.* v. *Zen-Noh Grain Corp.*, 913 F. 2d 1149 (CA5 1990), with, *e.g.*, *Paragon Oil Co.* v. *Republic Tankers, S. A.*, 310 F. 2d 169 (CA2 1962). The former interpretation allows a charterer to avoid liability by exercising due diligence in selecting a berth; the latter imposes liability for an unsafe berth without regard to the care taken by the charterer. Because we find it plain from the language of the safe-berth clause that CARCO warranted the safety of the berth it designated, we affirm the judgment of the Third Circuit.

## II

Maritime contracts "must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Norfolk Southern R. Co.* v. *James N. Kirby, Pty Ltd.*, 543 U. S. 14, 31 (2004); see also 2 T. Schoenbaum, Admiralty & Maritime Law §11:2, p. 7 (6th ed. 2018) ("[F]ederal maritime law includes general principles of contract law"). "'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *M&G Polymers USA, LLC* v. *Tackett*, 574 U. S. 427, 435 (2015) (quoting 11 R. Lord, Williston on Contracts §30:6, p. 108 (4th ed. 2012) (Williston)). In such circumstances, the parties' intent "can be determined from the face of the agreement" and "the language that they used to memorialize [that] agreement." 11 Williston §30:6, at 97–98, 112–113. But "[w]hen a written contract is ambiguous, its meaning is a question

of fact, requiring a determination of the intent of [the] parties in entering the contract"; that may involve examining "relevant extrinsic evidence of the parties' intent and the meaning of the words that they used." *Id.*, §30:7, at 116–119, 124 (footnote omitted).

A

Our analysis starts and ends with the language of the safe-berth clause. That clause provides, as relevant, that the charterer "shall . . . designat[e] and procur[e]" a "safe place or wharf," "provided [that] the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat." Addendum to Brief for Petitioners 8a. As even CARCO acknowledges, the clause plainly imposes on the charterer at least some "duty to select a 'safe' berth." Brief for Petitioners 21. Given the unqualified language of the safe-berth clause, it is similarly plain that this acknowledged duty is absolute. The clause requires the charterer to designate a "safe" berth: That means a berth "free from harm or risk." Webster's Collegiate Dictionary 1030 (10th ed. 1994); see also New Oxford American Dictionary 1500 (E. Jewell & F. Abate eds. 2001) ("safe" means "protected from or not exposed to danger or risk"). And the berth must allow the vessel to come and go "always" safely afloat: That means afloat "at all times" and "in any event." Webster's Collegiate Dictionary, at 35; see also New Oxford American Dictionary, at 47 ("always" means "at all times; on all occasions"). Selecting a berth that does not satisfy those conditions constitutes a breach. The safe-berth clause, in other words, binds the charterer to a warranty of safety.[3]

_____

[3] The central pillar of the dissent is that the safe-berth clause merely bestows upon the charterer "the *right* to 'designat[e]' the place of discharge," and thus apparently creates no duty to select a safe berth (much less a warranty of safety). *Post*, at 2 (opinion of THOMAS, J.) (quoting Addendum to Brief for Petitioners 8a; emphasis added); see also *post*, at

No matter that the safe-berth clause does not expressly invoke the term "warranty." It is well settled as a matter of maritime contracts that "[s]tatements of fact contained in a charter party agreement relating to some material matter are called warranties," regardless of the label ascribed in the charter party. 22 Williston §58.11, at 40–41 (2017); see also *Davison* v. *Von Lingen*, 113 U. S. 40, 49–50 (1885) (a stipulation going to "substantive" and "material" parts of a charter party forms "a warranty"); *Behn* v. *Burness*, 3 B. & S. 751, 122 Eng. Rep. 281 (K. B. 1863) ("With respect to statements in a [charter party] descriptive of . . . some material incident . . . , if the descriptive statement was intended to be a substantive part of the [charter party], it is to be regarded as a warranty"). What matters, then, is that the safe-berth clause contains a statement of material fact regarding the condition of the berth selected by the charterer.

Here, the safety of the selected berth is the entire root of the safe-berth clause: It is the very reason for the clause's inclusion in the charter party. And crucially, the charterer's assurance of safety is not subject to qualifications or conditions. Under any conception of materiality and any view of the parties' intent, the charterer's assurance surely counts as material. That leaves no doubt that the safe-

———————

3 ("the charterer has a right of selection"). That sidesteps the safe-berth clause's plain terms, which prescribe that the charterer "*shall* . . . designat[e] and procur[e]" a "safe place or wharf." Addendum to Brief for Petitioners 8a (emphasis added). As we have said before, "the word 'shall' usually connotes a requirement." *Kingdomware Technologies, Inc.* v. *United States*, 579 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 9); see also, *e.g.*, *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523 U. S. 26, 35 (1998). The text thus forecloses the dissent's permissive view that the charterer merely has an elective "right" to select a berth of discharge but no duty to do so. And even CARCO disclaims that atextual position. See Brief for Petitioners 21.

berth clause establishes a warranty of safety, on equal foot-
ing with any other provision of the charter party that in-
vokes express warranty language.[4]

CARCO resists this plain reading of the safe-berth
clause, arguing instead that the clause contains an implicit
limitation: The clause does not impose "strict liability," says
CARCO, or "liability without regard to fault."  Brief for Pe-
titioners 23, 25.  In effect, CARCO interprets the safe-berth
clause as imposing a mere duty of due diligence in the se-
lection of the berth.  See Tr. of Oral Arg. 19–20 (arguing
that "[CARCO] did [its] due diligence" in "selecting the port
or the berth"); *id.*, at 28 (suggesting that the safe-berth
clause is constrained "as a matter of due diligence in tort
concepts"); Reply Brief 5, n. 3 (asserting that a charterer's
liability under the safe-berth clause "should be addressed
through . . . sources of la[w] such as tort law").  But as a
general rule, due diligence and fault-based concepts of tort
liability have no place in the contract analysis required
here.  Under elemental precepts of contract law, an obligor
is "liable in damages for breach of contract even if he is
without fault."  Restatement (Second) of Contracts, p. 309
(1979) (Restatement (Second)).  To put that default contract-
law principle in tort-law terms, "Contract liability *is*

––––––––

[4] Because the materiality of the charterer's assurance of safety is plain
on the face of the charter party, the specific materiality issue here raises
no question of fact for a jury to resolve.  That is not to say that the mate-
riality of a statement in a charter party is always a question of law.  Nor
does the materiality analysis here bear on wholly different materiality
inquiries.  For not all questions of materiality are alike: Sometimes ma-
teriality is a question of law.  See, *e.g.*, 30 Williston §75:30, at 108
(whether an alteration of a contract is material).  Other times, it involves
factual determinations uniquely suited for a jury.  See, *e.g.*, *TSC Indus-
tries, Inc.* v. *Northway, Inc.*, 426 U. S. 438, 450 (1976) (whether a com-
pany's misstatements to the public are material for securities-fraud pur-
poses).  The dissent's insistence that materiality is a question of fact "'in
other contexts'"—such as securities fraud—thus is inapposite.  *Post*, at
8 (quoting *United States* v. *Gaudin*, 515 U. S. 506, 512 (1995)).

strict liability." *Ibid.* (emphasis added); see also 23 Williston §63:8, at 499 (2018) ("Liability for a breach of contract is, prima facie, strict liability"). What CARCO thus protests is the straightforward application of contract liability to a breach of contract.

Although contract law generally does not, by its own force, limit liability based on tort concepts of fault, parties are of course free to contract for such limitations. See Restatement (Second), at 309 (obligor who wishes to avoid strict liability for breach may "limi[t] his obligation by agreement"). Here, however, the safe-berth clause is clear that the parties contracted for no such thing. CARCO does not identify—nor can we discern—any language in the clause hinting at "due diligence" or related concepts of "fault." That omission is particularly notable in context: Where the parties intended to limit obligations based on due diligence elsewhere in the charter party, they did so expressly. See Addendum to Brief for Petitioners 4a (providing that the vessel "b[e] seaworthy, and hav[e] all pipes, pumps and heater coils in good working order, . . . so far as the foregoing conditions can be attained by the exercise of due diligence"); *id.*, at 13a (relieving vessel owner of responsibility for certain consequences of any "unseaworthiness existing . . . at the inception of the voyage [that] was discoverable by the exercise of due diligence"); *id.*, at 41a (requiring vessel owner to "exercise due diligence to ensure that [a drug and alcohol] policy [onboard the vessel] is complied with").[5] That the parties did not do so in the safe-berth

_____

[5] It also bears mention that many other industry form charter parties—not selected by CARCO and Star Tankers—explicitly limit the liability that may flow from a charterer's selection of a berth. See, *e.g.*, 2E J. Force & L. Lambert, Benedict on Admiralty, ch. XXVII, §27–567 (rev. 7th ed. 2019) (INTERTANKVOY form specifies that "[c]harterers shall exercise due diligence to ascertain that any places to which they order the vessel are safe for the vessel and that she will lie there always

clause specifically is further proof that they did not intend for such a liability limitation to inhere impliedly.[6]

Unable to identify any liability-limiting language in the safe-berth clause, CARCO points to a separate "general exceptions clause" in the charter party that exempts a charterer from liability for losses due to "perils of the seas." *Id.*, at 14a. According to CARCO, the "general exceptions clause" demonstrates that the parties did not intend the safe-berth clause to impose liability for a "peri[l] of the seas" like an abandoned anchor. That argument founders on a critical component of the "general exceptions clause": By its terms, it does not apply when liability is "otherwise . . . expressly provided" in the charter party. *Ibid.* The safe-berth clause, as explained above, expressly provides for liability stemming from the designation of an unsafe berth. The catchall "general exceptions clause" neither supersedes nor overlays it.[7]

Likewise immaterial is another clause of the charter

––––––––––––

afloat").

[6] After all, language that limits liability is necessary to overcome the default rule of strict liability for contractual breach. *Supra*, at 8–9. That stands in contrast to the established principle that charter parties can, at least in the circumstances here, create warranties without invoking express warranty language. *Supra,* at 7–8. The dissent overlooks this distinction when it claims that the absence of express warranty language in the safe-berth clause and the presence of it elsewhere in the charter party imply that no warranty may be found here. *Post*, at 4.

[7] At oral argument, CARCO urged that the abandoned anchor was not only "a peril of the sea" but also "an abnormal occurrence." Tr. of Oral Arg. 28–29. CARCO's "abnormal occurrence" argument appears to rest on a recent decision by the Supreme Court of the United Kingdom interpreting a safe-berth clause not to impose liability if an "abnormal occurrence" rendered the selected berth unsafe. See *Gard Marine & Energy Ltd.* v. *China Nat. Chartering Co.*, [2017] UKSC 35 (*The Ocean Victory*). In its opening brief to this Court, however, CARCO did not cite *The Ocean Victory* or argue that the abandoned anchor here constituted an "abnormal occurrence."

party that requires Star Tankers to obtain oil-pollution insurance. According to CARCO, that clause evidences the parties' intent to relieve CARCO of oil-spill liability under the safe-berth clause. But the oil-pollution insurance that Star Tankers must obtain covers risks beyond simply those attendant to the selection of an unsafe berth. And CARCO's reading of the insurance clause (as relieving CARCO of oil-spill liability) does not square with its reading of the safe-berth clause (as imposing such liability when CARCO fails to exercise due diligence).

Finally, CARCO offers an alternative interpretation of the safe-berth clause that focuses on the vessel master's right instead of the charterer's duty. This alternative interpretation proceeds from the subclause specifying that the selected berth be one that the vessel may "proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage [*i.e.*, transfer of goods between vessels] being at the expense, risk and peril of the Charterer." *Id.*, at 8a. On CARCO's reading, that subclause means that the vessel master has a right to refuse entry into a berth that the master perceives to be unsafe, and the charterer must pay any expenses resulting from the refusal. We have, to be sure, recognized that similarly worded safe-berth clauses may implicitly denote a vessel master's right to refuse entry and the charterer's resultant obligation to bear the costs of that refusal. See *Mencke* v. *Cargo of Java Sugar*, 187 U. S. 248 (1902); *The Gazelle and Cargo*, 128 U. S. 474 (1888). But that a charterer may be liable for expenses when a vessel master justifiably refuses to enter an unsafe berth in no way abates the scope of the charterer's liability when a vessel in fact enters an unsafe berth. And a tacit recognition of a vessel master's right of refusal does not overwrite the safe-berth clause's express prescription of a warranty of safety.

The dissent, too, offers an alternative interpretation. It claims that if the safe-berth clause binds the charterer to a

warranty of safety, the clause must bind the vessel master to effectively the same warranty—due to the clause's statement that "'[t]he vessel shall load and discharge at [a] safe place or wharf.'" *Post*, at 6 (quoting Addendum to Brief for Petitioners 8a). Because that would "creat[e] contradictory warranties of safety," the dissent continues, the safe-berth clause must not bind the charterer to a warranty of safety (or, apparently, impose an obligation on the charterer at all). *Post*, at 7. This conclusion does not follow because the conflict diagnosed by the dissent does not exist.

The safe-berth clause says that "[t]he vessel shall load and discharge at any safe place or wharf, . . . which shall be designated and procured by the Charterer." Addendum to Brief for Petitioners 8a. Plainly, that means that the "safe place or wharf . . . shall be designated and procured by the Charterer." *Ibid.* The vessel master's duty is only to "load and discharge" at the chosen safe berth. *Ibid.* (Not, as the dissent urges, at any safe berth the vessel master so desires regardless of the charterer's contractually required selection. *Post*, at 6, n. 4.) On its face, the vessel master's duty creates no tension with the charterer's duty. And it strains common sense to insist (as the dissent does) that the vessel master implicitly has a separate, dueling obligation regarding the safety of the berth, when the clause explicitly assigns that responsibility to the charterer. *Post*, at 6–7. Perhaps the dissent says it best: We must "reject [this] interpretation that . . . 'se[ts] up . . . two clauses in conflict with one another.'" *Post*, at 6 (quoting *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 64 (1995)).

We instead take the safe-berth clause at face value. It requires the charterer to select a safe berth, and that requirement here amounts to a warranty of safety.

## B

CARCO's remaining arguments point to authorities that have purportedly construed safe-berth clauses to contain

limitations on liability. These arguments find no foothold in the language of the charter party at issue here. And none is otherwise convincing.

CARCO asserts, for instance, that a leading admiralty treatise has urged that safe-berth clauses ought not be interpreted as establishing a warranty. See G. Gilmore & C. Black, Law of Admiralty §4–4, p. 205 (2d ed. 1975) (Gilmore & Black). Gilmore and Black's position, however, stemmed from their belief that vessel masters or vessel owners are generally better positioned than charterers to bear the liability of an unsafe berth. See *ibid.* (reasoning that charterers "may know nothing of the safety of ports and berths, and [are] much less certain to be insured against" liability for losses stemming from an unsafe berth).[8] Gilmore and Black also acknowledged that, as of 1975, many courts had not interpreted safe-berth clauses in the manner that they proposed. See *id.*, at 204, and n. 34a, 206, and n. 36. Whatever Gilmore and Black sought to prevail upon courts to adopt as a prescriptive matter does not alter the plain meaning of the safe-berth clause here.

CARCO next contends that in *Atkins* v. *Disintegrating Co.*, 18 Wall. 272 (1874), this Court acknowledged that safe-berth clauses do not embody a warranty of safety. That

_____

[8] The dissent's claim that Gilmore and Black looked to "'the very words of the usual clauses,'" *post*, at 3, n. 1 (quoting Gilmore & Black §4–4, at 204), relies on a discussion not of the charterer's obligation under the safe-berth clause but of the vessel master's lack of such obligation, Gilmore & Black §4–4, at 204–205. At most, Gilmore and Black "suggested" that interpreting safe-berth clauses to relieve vessel masters of any obligation to enter an unsafe berth "might easily be read to contradict" any "affirmative liability" on the part of the charterer "in case of mishap." See *id.*, §4–4, at 205. But that supposition is at odds with the language of the safe-berth clause here, which (as even CARCO acknowledges) plainly contemplates at least some liability for the charterer's designation of an unsafe berth. *Supra*, at 6–7, and n. 3, 8. And as explained, a vessel master's ability to refuse entry into an unsafe berth does not logically or textually diminish a charterer's liability when the vessel master in fact enters an unsafe berth selected by the charterer. *Supra*, at 11.

greatly overreads *Atkins*. In that case, this Court affirmed a District Court's ruling that, although the berth selected by the charterer was not safe, the vessel master had "waived" the protection of the safe-berth clause. *Atkins* v. *Fibre Disintegrating Co.*, 2 F. Cas. 78, 79 (EDNY 1868); see *Atkins*, 18 Wall., at 299. No one posits that the District Court's waiver holding has any significance in this case. CARCO, however, points to language in the District Court's opinion observing that the "safe" berth referenced in the charter party "impl[ied one] which th[e] vessel could enter and depart from without legal restraint, and without incurring more than the ordinary perils of the seas." *Atkins*, 2 F. Cas., at 79. But the District Court's remark—that a berth may be safe even if certain perils lurk within—did not bear on its finding that the berth in question was *un*safe or its holding that the vessel master had "waived" the protection of the safe-berth clause. When this Court approved of the District Court's "views" and "conclusions," *Atkins*, 18 Wall., at 299, it did not adopt as controlling precedent—for all safe-berth clauses going forward—an observation that was not controlling even for the District Court.

Also misplaced is CARCO's reliance on *Orduna S. A.*, 913 F. 2d 1149. True, the Fifth Circuit there held that a similarly unqualified safe-berth clause imposed a duty of due diligence. *Id.*, at 1157. But in so holding, the court did not purport to interpret the language of the safe-berth clause at issue in that case. *Id.*, at 1156–1157. Instead, it looked principally to tort law and policy considerations. See, *e.g.*, *id.*, at 1156 ("requiring negligence as a predicate for the charterer's liability does not increase the risk that the vessel will be exposed to an unsafe berth"); *id.*, at 1157 ("no legitimate legal or social policy is furthered by making the charterer warrant the safety of the berth it selects"). Neither tort principles nor policy objectives, however, override the safe-berth clause's unambiguous meaning.

More consistent with traditional contract analysis is the

Second Circuit's long line of decisions interpreting the language of unqualified safe-berth clauses to embody an express warranty of safety. See, *e.g.*, *Paragon Oil Co.*, 310 F. 2d, at 172–173 ("the express terms of [the] contract" established a "warranty" obliging the charterer "to furnish, not only a place which he believes to be safe, but a place where the chartered vessel can discharge 'always afloat'" (some internal quotation marks omitted)); *Park S. S. Co.* v. *Cities Serv. Oil Co.*, 188 F. 2d 804, 805–806 (CA2 1951) ("the natural meaning of 'safe place' is a place entirely safe, not an area only part of which is safe," and "the charter party was an express assurance that the berth was safe"); *Cities Serv. Transp. Co.* v. *Gulf Refining Co.*, 79 F. 2d 521 (CA2 1935) (*per curiam*) (the "charter party was itself an express assurance . . . that at the berth 'indicated' the ship would be able to lie 'always afloat'"). Those decisions, which focused on the controlling contract language, all point in the same direction: When the language of a safe-berth clause obliges a charterer to select a safe berth without qualifying the charterer's duty or the assurance of safety that language establishes a warranty. That aligns with our decision today.[9]

## III

We conclude that the language of the safe-berth clause here unambiguously establishes a warranty of safety, and that CARCO has identified "no reason to contravene the clause's obvious meaning." *Kirby*, 543 U. S., at 31–32. We emphasize, however, that our decision today "does no more than provide a legal backdrop against which future [charter parties] will be negotiated." *Id.*, at 36. Charterers remain

—————

[9] The parties also dispute whether the prevailing industry usage of safe-berth clauses supports reading the safe-berth clause here as a warranty or as a promise of due diligence. Because the express language of the safe-berth clause is susceptible to only one meaning, we need not address these arguments.

free to contract around unqualified language that would otherwise establish a warranty of safety, by expressly limiting the extent of their obligations or liability.

\* \* \*

For the foregoing reasons, we conclude that the plain language of the safe-berth clause establishes a warranty of safety and therefore affirm the judgment of the Third Circuit.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 18–565

CITGO ASPHALT REFINING COMPANY, ET AL.,
PETITIONERS *v.* FRESCATI SHIPPING
COMPANY, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[March 30, 2020]

JUSTICE THOMAS, with whom JUSTICE ALITO joins,
dissenting.

The majority concludes that the safe-berth clause in the
contract at issue unambiguously created a warranty of
safety by the charterer. Although this interpretation pro-
vides a clear background rule for the maritime industry to
contract against, it is the wrong rule and finds no basis in
the contract's plain text. I would hold that the plain lan-
guage of the safe-berth clause contains no warranty of
safety and remand for factfinding on whether industry cus-
tom and usage establish such a warranty in this case. Ac-
cordingly, I respectfully dissent.

I

In 2001, Star Tankers Inc. (Star) entered into a voyage
charter party with CITGO Asphalt Refining Company
(CARCO). That contract included a safe-berth clause that
provided:

> "SAFE BERTHING — SHIFTING. The vessel shall
> load and discharge at any safe place or wharf, or along-
> side vessels or lighters reachable on her arrival, which
> shall be designated and procured by the Charterer, pro-
> vided the Vessel can proceed thereto, lie at, and depart
> therefrom always safely afloat, any lighterage being at

the expense, risk and peril of the Charterer." Addendum to Brief for Petitioners 8a.

I agree with the majority that we must interpret the safe-berth clause "by [its] terms and consistent with the intent of the parties." *Norfolk Southern R. Co.* v. *James N. Kirby, Pty Ltd.*, 543 U. S. 14, 31 (2004). Unlike the majority, however, I conclude that the plain meaning of the safe-berth clause does not include a warranty of safety.

## A

The safe-berth clause sets out the rights and obligations of the vessel master and the charterer. The clause requires the vessel master to "load and discharge at [a] safe place or wharf," but it also gives the master the right to refuse to proceed if the vessel cannot "lie at, and depart therefrom always safely afloat." Addendum to Brief for Petitioners 8a. The charterer has the right to "designat[e]" a "safe place or wharf" for discharge. *Ibid.* That right, however, must be exercised by the charterer, see *ibid.* (using mandatory language), and the act of designation must be made in good faith, see Restatement (Second) of Contracts §205 (1979). The right to designate is limited to places that the vessel can reach, with the charterer bearing the "expense, risk and peril" of any "lighterage" (*i.e.,* transfer of cargo by means of another vessel) resulting from its selection. Addendum to Brief for Petitioners 8a. As the leading admiralty treatise succinctly explains, the safe-berth clause provides that "if the port or the berth is unsafe, the master is excused from taking his ship in, and the charterer must bear the extra expense . . . entailed by [a proper] refusal" of its selected place of discharge. G. Gilmore & C. Black, Law of Admiralty §4–4, p. 204 (2d ed. 1975).[1]

---

[1] The majority states that the views of Gilmore and Black "stemmed from their belief that vessel masters or vessel owners are generally better positioned than charterers to bear the liability of an unsafe berth." *Ante*, at 13. While the treatise does contain policy-based arguments, it

This reading is consistent with this Court's prior decisions. The Court has interpreted safe-berth clauses as providing a limit on the "right to select a dock." *Mencke* v. *Cargo of Java Sugar*, 187 U. S. 248, 253 (1902); see also *The Gazelle and Cargo*, 128 U. S. 474, 485–486 (1888) (holding that the right of selection is limited by the terms of the contract). And it has concluded that, if a charterer selects a place of discharge that cannot be safely reached, the charterer is liable for lighterage expenses. *Mencke*, 187 U. S., at 253–254.

Thus, under the plain language of the safe-berth clause, the vessel master has a duty of discharge and right of refusal, while the charterer has a right of selection and duty to pay for lighterage.

## B

The majority does not disagree that the safe-berth clause confers these duties and rights. Quite the opposite. It recognizes our precedents as embracing this understanding. *Ante*, at 11. The majority concludes, however, that in addition to the rights of selection and refusal, the language of the safe-berth clause "unambiguously" establishes a warranty of safety by the charterer. *Ante*, at 15. With this, I cannot agree.

### 1

The majority first concludes that the safe-berth clause contains an "express prescription of a warranty of safety."

---

also looks to "the very words of the usual clauses" to conclude that the master's clear textual right to refuse to enter an unsafe port "might easily be read to contradict" an interpretation of a safe-berth clause that "creat[es] an affirmative liability of charterer to ship, in case of mishap." Gilmore & Black, Law of Admiralty §4–4, at 204–205. Gilmore and Black's review of safe-berth clauses contains just as much, if not more, analysis of the text than the conclusory assertions of the majority. See *ante*, at 6.

*Ante*, at 11; see also *ante,* at 6.  This assertion finds no sup-
port whatsoever in the plain language of the clause.

First of all, the contract between Star and CARCO con-
tains no express warranty of safety by the charterer, though
the parties repeatedly used express language to create war-
ranties elsewhere in the contract.  See Addendum to Brief
for Petitioners 26a ("Charterer's warrant . . ."), 30a ("Own-
ers warrant . . ."), *ibid.* ("Owner warrants . . ."), 31a
("Owner warrants . . ."), 41a ("Owner warrants . . ."), 42a
("Owner warrants . . ."), 43a ("Owner warrants . . ."), 44a
("Owner warrants . . ."), 45a ("Owner warrants . . .").  In
contrast, they did not state that the charterer "warrants"
the safety of the place of discharge in the safe-berth clause.
As the majority obliquely recognizes—when trying to rebut
a different argument—"[t]hat omission is particularly nota-
ble in context: Where the parties intended to [create war-
ranties] elsewhere in the charter party, they did so ex-
pressly."  *Ante*, at 9.  "That the parties did not do so in the
safe-berth clause specifically is . . . proof that they did not
intend for such a . . . limitation to inhere impliedly."  *Ante*,
at 9–10.[2]

But even setting aside this evidence of the parties' intent
(as the majority does), the safe-berth clause contains no lan-
guage that can be construed to create a warranty of safety.
Nor does the clause so much as suggest that the charterer

_____

[2] Attempting to avoid the inconsistent application of its own principle,
the majority claims there is a distinction between language limiting lia-
bility and language creating liability.  *Ante*, at 10, n. 6.  In the majority's
view, express language is "necessary" to limit liability, but the parties
can create warranty liability in numerous ways.  *Ibid.*  Even assuming
that is correct, it does not negate the proof of the parties' intent here.
The majority can point to no example of the parties "creat[ing] warran-
ties without invoking express warranty language" in this contract.  *Ibid.*
By contrast, the contract contains no fewer than nine clauses using ex-
press language to create a warranty.  The commonsense conclusion is
that, when the parties intended to create a warranty, they used express
language to do so.

is liable for all damages arising out of unsafe port conditions. In fact, the trade association that promulgated the ASBATANKVOY form used in this case specifically acknowledged that the language of "the clause *does not specify* whether the charterer absolutely warrants the safety of the berth." Brief for Maritime Law Association of the United States and the Association of Ship Brokers & Agents (USA) Inc. as *Amici Curiae* on Pet. for Cert. 19 (emphasis added).

Notwithstanding this, the majority states that the clause "requires the charterer to designate a 'safe' berth" and that requirement "binds the charterer to a warranty of safety." *Ante*, at 6. But certainly not every obligation in a contract is a warranty. See *Brooks, Tarlton, Gilbert, Douglas & Kressler* v. *United States Fire Ins. Co.*, 832 F. 2d 1358, 1375, n. 14 (CA5 1987). Parties often agree to obligations that govern only their conduct without making any assurances as to an ultimate result. For example, "[a] promise to repair parts of [a] powertrain for six years is a promise that the manufacturer will behave in a certain way, not a warranty that the vehicle will behave in a certain way." *Cosman* v. *Ford Motor Co.*, 285 Ill. App. 3d 250, 257, 674 N. E. 2d 61, 66 (1996). The majority does not confront, or even acknowledge, this distinction. Instead, it indifferently conflates a duty to take a certain action—"designat[e]" a wharf understood to be safe—with a warranty guaranteeing a certain result—the ultimate safety of the berth.[3]

By conflating an action with an outcome, the majority converts every obligation tangentially related to safety into a warranty of safety. Consider the contract in this case, for example. If the language stating that the charterer "shall

--------

[3] I am skeptical that the phrase "place or wharf" can be read to include the entire berth. But CARCO failed to develop any argument related to the scope of this phrase, so I do not address the issue.

. . . designat[e] and procur[e]" a "safe place or wharf" creates a warranty of safety, then so does the language stating that "[t]he vessel shall load and discharge at [a] safe place or wharf." Addendum to Brief for Petitioners 8a. There is no textual reason that an obligation to "designat[e]" is any different from an obligation to "discharge." *Ibid.* And policy-based rationalizations cannot justify a distinction because "[n]either tort principles nor policy objectives . . . override the safe-berth clause's unambiguous meaning." *Ante*, at 14. Thus, employing the majority's approach, the safe-berth clause contains two competing warranties of safety—one from the charterer and one from the vessel master—that could impose conflicting obligations.[4] Courts typically avoid construing contracts in such a manner. See *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 64 (1995) (rejecting an interpretation that the Court believed "se[t] up . . . two clauses in conflict with one another"); *United States* v. *Pielago*, 135 F. 3d 703, 710 (CA11 1998) ("It is a cardinal principle of contract law that no term of a contract should be construed to be in conflict with another unless no other reasonable construction is possible").

_____

[4] To support its assertion that no conflict exists, the majority rewrites the text of the safe-berth clause. The majority asserts that "[t]he vessel master's duty is only to 'load and discharge' *at the chosen safe berth*." *Ante*, at 12 (emphasis added). But that is not what the clause says. The safe-berth clause states: "The vessel shall load and *discharge at any safe place or wharf*." Addendum to Brief for Petitioners 8a (emphasis added). And, by requiring the charterer to pay for lighterage expenses resulting from the designation of an unsafe port, the clause specifically contemplates the vessel master declining to discharge at a place or wharf that is not safe. *Ibid.*; see also *Mencke* v. *Cargo of Java Sugar*, 187 U. S. 248, 253 (1902) (requiring the charterer to pay lighterage expenses where vessel discharged at a location other than the chosen berth). The "which" clause in the provision—"which shall be designated and procured by the Charterer"—modifies "place or wharf," creating a separate obligation for the charterer. Addendum to Brief for Petitioners 8a. That separate obligation, however, does not negate the express obligation imposed on the vessel. *Ibid.* (emphasis added).

Setting aside this contract, the majority makes no attempt to limit its expansive interpretive approach or provide the barest of explanation as to why all obligations that involve the word "safe" should not be construed as warranties of safety.

In a contract replete with express language creating warranties, I would not construe the plain language of the safe-berth clause as indirectly creating contradictory warranties of safety. And I certainly cannot agree with the majority's conclusion that the safe-berth clause "unambiguously" establishes a warranty of safety by the charterer. *Ante*, at 15.

2

Perhaps recognizing the weakness of its assertion that the safe-berth clause contains a duty or warranty of safety, the majority pivots to an independent legal theory. It claims that the safe-berth clause constitutes a material statement of fact and therefore creates a warranty. *Ante*, at 7. The majority's invocation of this theory is puzzling, to say the least.

As an initial matter, this issue was not preserved in the Court of Appeals, which, understandably, did not address the question. *In re Frescati Shipping Co., Ltd.*, 718 F. 3d 184, 200–203 (CA3 2013). Nor was the issue developed before this Court. All we have before us is one conclusory paragraph in the United States' brief. See Brief for United States 25. Accordingly, I would decline to address this unpreserved and undeveloped issue.

Even setting aside forfeiture, the majority's analysis is questionable in multiple respects. First, the majority asserts that "the safe-berth clause contains a statement of material fact regarding the condition of the berth selected by the charterer." *Ante*, at 7. Not so. The safe-berth clause says nothing about the safety of the port actually selected by CARCO (the Paulsboro berth), or any specific berth for

that matter.  It states only that the charter "shall . . . designat[e]" a place or wharf.  The majority infers from CARCO's selection of the Paulsboro berth that CARCO believed the place or wharf was safe.  But that is not a statement of fact; it is an inference.  I hesitate to equate the two without briefing on the issue, or even a single example of a court adopting this approach.

Second, even assuming the safe-berth clause contains a statement of fact, it is not clear that the Court is in a position to decide whether that statement of fact is "material." Many jurisdictions appear to treat materiality as a question of fact when determining whether a statement creates a warranty. *Royal Bus. Machines*, *Inc.* v. *Lorraine Corp.*, 633 F. 2d 34, 43 (CA7 1980) ("Whether a seller affirmed a fact or made a promise amounting to a warranty is a question of fact reserved for the trier of fact"); *McDonnell Douglas Corp.* v. *Thiokol Corp.*, 124 F. 3d 1173, 1176 (CA9 1997) ("Whether the seller's representations formed part of the basis of the parties' bargain is a question of fact"); *Crothers* v. *Cohen*, 384 N. W. 2d 562, 563 (Minn. App. 1986) ("Whether a given representation constitutes a warranty is ordinarily a question of fact for the jury"); *General Supply & Equip. Co.* v. *Phillips*, 490 S. W. 2d 913, 917 (Tex. Civ. App. 1972) (citing cases from Illinois, Iowa, Alabama, and Ohio).  And "our cases have recognized in other contexts that the materiality inquiry, involving as it does 'delicate assessments of the inferences a "reasonable [decisionmaker]" would draw from a given set of facts and the significance of those inferences to him, . . . [is] peculiarly on[e] for the trier of fact.'" *United States* v. *Gaudin*, 515 U. S. 506, 512 (1995).  Although this Court has relied on factual findings to support a materiality conclusion, *Davison* v. *Von Lingen*, 113 U. S. 40, 50 (1885), I am not aware of a case in which this Court has treated the materiality inquiry as a pure question of law without relying on any factual findings whatsoever.  Again, without briefing on

this issue, I would hesitate to depart, without explanation, from the approach taken by many courts throughout the country.

Third, assuming the contract contains a statement of fact regarding the safety of the berth and further assuming that materiality is a question of law, I am unpersuaded by the majority's materiality analysis. Materiality must turn at least in part on a statement's "tendency to induce the making of the contract." 22 R. Lord, Williston on Contracts §58.11, p. 41 (4th ed. 2017). The majority's opinion says nothing about that (likely fact-driven) question. It first states that the safety of the selected berth is "the entire root of the safe-berth clause" and "the very reason for the clause's inclusion." *Ante*, at 7. Even accepting the majority's interpretation, merely proving that a statement is included in a contract does not mean that it is material. If that were the law, then every statement in a contract would be material and therefore constitute a warranty. That cannot be right. The majority next concludes that "[u]nder any conception of materiality and any view of the parties' intent, the charterer's assurance [of safety with no conditions] surely counts as material." *Ibid.* But what is the basis for this conclusion? The majority's experience negotiating maritime contracts? It defies reality to assert that a standard provision in a form contract—which has been subject to different interpretations for nearly three decades—induced *every single vessel master* using that form contract to enter into the agreement. We should recognize this for what it is: an unsupported judicial pronouncement on a question of fact.

The majority's attempt to shore up its analysis with its alternative statement-of-fact theory makes no difference to the outcome of this case, because the majority erroneously holds that the safe-berth clause contains an absolute duty that was breached. See *ante*, at 6; *supra*, at 3–7. But its unreasoned dicta will undoubtedly cause problems for

lower courts and parties in the future.

## II

The lack of unambiguous language creating a warranty of safety in the safe-berth clause does not end our inquiry. "'In this endeavor, as with any other contract, the parties' intentions control.'" *M&G Polymers USA, LLC* v. *Tackett*, 574 U. S. 427, 435 (2015) (quoting *Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l Corp.*, 559 U. S. 662, 682 (2010)); see also *ante*, at 5–6. The vessel's owner and the United States argue that, setting aside the plain meaning of the contract's text, longstanding industry custom supports interpreting the safe-berth clause as a warranty of safety. I would remand for factfinding on this issue.

Under both "general maritime law" and ordinary principles of contract interpretation, evidence of an established "custom and usage" can be used as an aid to "determin[e] the parties' intent" and the meaning of the language included in the contract. *Stolt-Nielsen*, 559 U. S., at 674, n. 6 (internal quotation marks omitted); see also U. C. C. §1–303 Comment 3 (2017); Restatement (Second) of Contracts §220. But "the existence and scope of a particular usage is usually a question of fact." *Sun Oil Co.* v. *Wortman*, 486 U. S. 717, 732, n. 4 (1988); see also U. C. C. §1–303(c); Restatement (Second) of Contracts §219, Comment *a*; §222(2). Here, we have no factual findings from the District Court to support a custom-or-usage argument. Such findings seem particularly necessary in this case: "A trade usage can of course be confined to a particular geographical area," 5 M. Kniffin, Corbin on Contracts §24.13, p. 110 (J. Perillo ed., rev. 1998), and different areas of the country appeared to have different understandings of the safe-berth clause at the time of contracting. See *ante*, at 5 (recognizing Circuit split); Brief for North American Export Grain Association as *Amicus Curiae* 9 (stating that in "New Orleans . . . safe-

THOMAS, J., dissenting

berth clauses are understood to impose due diligence obligations"). Accordingly, I would remand for factual findings on the question whether the parties entered into the charter party with knowledge of an established custom or usage.

\*  \*  \*

I appreciate the majority's desire to interpret the safe-berth clause in a manner that provides clarity to the maritime industry. The plain meaning of the contract's text, however, does not support the majority's interpretation. Fortunately, the majority's opinion applies only to this specific contract, and its assertions regarding a material statement of fact are but dicta. Because I would reverse the judgment of the Court of Appeals and remand for further proceedings, I respectfully dissent.